**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

and

**Vantage Steamship Corporation et al., Intervenors,**

v.

**NATIONAL MARITIME UNION OF AMERICA, AFL–CIO, Respondent.**

No. 2, Docket 72–2268.

United States Court of Appeals, Second Circuit.

Argued Sept. 11, 1973.

Decided Oct. 10, 1973.

John H. Ferguson, Atty., N.L.R.B. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Acting Asst. Gen. Counsel; William F. Wachter, Atty., Washington, D. C., on the brief), for petitioner.

Martin C. Seham, New York City, (Surrey, Karasik, Morse & Seham, Fred C. Klein, and Susan A. Powers, New York City, on the brief), for intervenor Vantage Steamship Corp.

Benjamin Schlesinger, New York City, (Schulman, Abarbanel & Schlesinger, Howard Schulman, New York City, on the brief), for intervenors Seafarers International Union of North America and Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters Dist.

Charles Sovel, New York City (Abraham E. Freedman, New York City, on the brief), for respondent.

Before LUMBARD, FRIENDLY and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

For the fourth time in less than two years, the bitter rivalry between two maritime unions gives rise to knotty legal problems in this court. See also McLeod v. National Maritime Union, 457 F.2d 490 (2d Cir. 1972); National Maritime Union v. Commerce Tankers Corp., 457 F.2d 1127 (2d Cir. 1972); NLRB v. National Maritime Union, No. 72–2349 (2d Cir. June 18, 1973), enforcing in open court, National Maritime Union, 198 N.L.R.B. No. 112 (1972). On this occasion, the National Labor Relations Board seeks enforcement of its order holding that the National Maritime Union of America, AFL–CIO (NMU) and Commerce Tankers Corporation violated section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), by enforcing a provision in their collective bargaining agreement so as to prevent Commerce from selling one of its vessels to Vantage Steamship Corporation. Commerce Tankers Corp., 196 N.L.R.B. No. 165 (1972). Vantage was and is party to a labor agreement with the Seafarers International Union of North America (SIU). Both Vantage and the SIU, the latter joined by an affiliate, have intervened in this proceeding in support of the Board. For reasons set forth below, we enforce the Board's order.

### I

The clause at issue is Article I, section 2 of the 1969 contract between Commerce and the NMU. This section, which is reproduced in the margin,[1] provides in substance that if Commerce sells a ship to an American flag shipper not already under contract with the NMU, the ship will be sold with a crew provided by the NMU, and Commerce

---

1. Article I, section 2, which is entitled "Sale and Transfer of Vessels," provides:

   (a) The Company agrees with respect to any vessel which is presently under or may hereafter come under this Agreement, that if during the term of this Agreement said vessel is sold or transferred in any manner to any other business entity not covered by this Agreement for operation under United States flag (but not including a vessel which the Company bareboat charters and the charter is terminated), said vessel shall be sold or transferred with the complement of employees who either are or shall be provided by the Union in accordance with the terms of this Agreement, or such number as may be agreed upon between the Union and the transferee. The term "transfer" shall be construed to include any chartering of a vessel by the Company.

   (b) The Company obligates itself to obtain for the benefit of the Union a written undertaking with the Union to be executed by the business entity to which the vessel has been sold or transferred that for the full term of the Agreement all of its terms and provisions shall apply to said vessel except as herein-above provided and that said business entity will fully comply with all of the terms and provisions of this Agreement and any amendments thereto to preserve the jobs and job rights of the Unlicensed Personnel covered by this Agreement and to protect and maintain the wages, pension rights and other economic benefits and working conditions provided such personnel under this Agreement.

will obtain from the purchaser an undertaking to abide by the NMU contract. At the time of the agreement, Commerce owned two ships and in December 1970 sold one of them, the S.S. Thalia. Since the purchaser was a signatory to the standard NMU contract, no problem of inter-union rivalry arose.

However, later in the same month, Commerce agreed to sell its remaining vessel, the S.S. Barbara, to Vantage, which, together with its subsidiaries, operated a number of vessels whose employees were represented by the SIU. Very soon thereafter, both Commerce and Vantage found themselves caught between the competing demands of the two unions and frantic activity ensued in a variety of forums. Under pressure from the NMU, Commerce asked Vantage to give the undertaking required by Article I, section 2. The SIU threatened to strike all the vessels operated by Vantage if it stopped using the SIU hiring hall as the exclusive source of its unlicensed seamen.[2] Vantage understandably refused to accede to the NMU-inspired demand, and threatened to sue Commerce if it did not sell the S.S. Barbara, as it had agreed to do. Similarly, the NMU refused to waive its contractual rights and promptly secured an arbitration award restraining Commerce from delivering the Barbara to Vantage without complying with the ship transfer provisions of the NMU contract. A month later, this award was confirmed and a preliminary injunction in favor of the NMU was issued by the United States District Court for the Southern District of New York. 325 F.Supp. 360.[3] In the interim, Vantage filed a charge with the National Labor Relations Board alleging that both the NMU and Commerce were violating section 8(e) of the Act. In May 1971, also in the Southern District, the Board's Regional Director sought an injunction under section 10(l) of the Act, 29 U.S.C. § 160(l), on the ground that he had reasonable cause to believe that the NMU and Commerce were violating section 8(e) of the Act. The injunction was denied. 329 F.Supp. 151. Appeals were taken both from this order and from the earlier Southern District order enjoining the sale of the vessel. The appeals were consolidated, and in March 1972 this court reversed both orders. 457 F. 2d 1127. Even before issuance of the 10(l) injunction, however, the Board proceedings went forward. In September 1971, the Trial Examiner found that the contract clause did not violate section 8(e) because it "is purely a work preservation clause." In May 1972, the full Board unanimously concluded to the contrary,[4] and this petition for enforcement of its order followed.

## II

Now that the dust has settled somewhat,[5] the precise legal question before us is simple to state but difficult to decide: Did the NMU violate section 8(e) of the Act by maintaining and enforcing Article I, section 2 (see note 1 supra) of the NMU-Commerce collective

2. Under the NMU contract, of course, Vantage would have to use the NMU hiring hall.

3. Subsequently, Commerce commenced an arbitration against Vantage to enforce the contract of sale and, in addition, to require compliance with the NMU clause on the basis of an oral promise allegedly made by Vantage. The arbitrators 2–1 found for Commerce. On December 5, 1972, the award was enforced by Judge Gellinoff of the New York Supreme Court in an unreported opinion, and the Appellate Division 3–2 affirmed on the basis of that opinion. Vantage S.S. Corp. v. Commerce Tankers Corp., 41 A.D.2d 813, 342 N.Y.S.2d 281 (1973).

4. The Board's decision and order was subsequently amended in May and in August 1972, without changing the result.

5. Whether the dust has similarly settled on the S.S. Barbara, we do not know. On the prior appeal to this court, Judge Waterman plaintively observed that the legal activity of the parties
   is in marked contrast to the inactivity of the subject of the contract, the tanker *Barbara*, which sits idly in a shipyard in Mobile for the lack of unlicensed seamen to man her.
   457 F.2d at 1130.

bargaining agreement? Section 8(e) makes it an unfair labor practice for a union and an employer

> to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person
>
> . . . ..

Before examining the judicial gloss on section 8(e) most pertinent here, we must note a preliminary problem. In finding a violation of the section in this case, the Board relied on the portion that makes it an unfair labor practice for a union (NMU) and an employer (Commerce) to agree to "cease doing business with any other person" (Vantage). It may at least be doubted whether an isolated sale of a capital item such as a ship comes within this language. It is arguable that such a transaction does not fit either the letter of the statute or the probable congressional purpose. However, although the Board faced the issue squarely and held that sales of ships occurred "in the normal course of doing business in the maritime industry," NMU counsel, at oral argument, expressly disclaimed reliance upon this point. Accordingly, we will assume—without deciding for the future —that in the ship-sale transaction, Commerce and Vantage were "doing business" with each other and that the disruption of the transaction was a cessation of this.

Section 8(e) was enacted in 1959 as part of the Landrum-Griffin amendments to the National Labor Relations Act, which were designed to correct what many employers and members of Congress thought were statutory deficiencies in dealing with secondary boycotts.[6] In Carpenters Local 1976 v.

NLRB, 357 U.S. 93, 78 S.Ct. 1011, 2 L. Ed.2d 1186 (1958) (Sand Door), the Supreme Court had held that an employer's voluntary observance of a clause in his agreement with his employees not to handle nonunion goods was lawful under what was then section 8(b)(4)(A) of the Labor Act. 357 U.S. at 98–99, 78 S. Ct. 1011. Section 8(e) was designed "to plug this gap in the legislation by making the . . . clause itself unlawful." National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 634, 87 S.Ct. 1250, 1263, 18 L.Ed.2d 357 (1967). But section 8(e) like other sections designed to curb secondary activity, does not shimmer with clarity, and it has been a source of much litigation. See The Developing Labor Law, note 6 supra, at 645–74.

The Board held in this case that because Article I, section 2 of the contract prevented Commerce from selling a ship to Vantage, the clause was prohibited as one

> whereby an employer agrees, in substance, to cease or refrain from doing business with any other person within the meaning of Section 8(e) of the Act.

The NMU argues to us, as it did before the Board, that the clause was entirely proper because its objective was to preserve work for its members. Both parties, and the intervenors, support their positions with language from *National Woodwork*, supra, the only section 8(e) case decided by the Supreme Court.

*National Woodwork* involved a contract provision negotiated by the Carpenters Union under which its members would not "handle" doors which had been "fitted" prior to being furnished on the job. Such precut and prefitted doors could be obtained from manufacturers, but doing so eliminated preparatory work which had been "traditionally performed in the . . . area by the

---

6. The statute does not use the phrase "secondary boycott," and many secondary pressures are completely legal, as will be seen below. For a comprehensive, yet surprisingly compact, history of the law regarding sec-

ondary activity, see The Developing Labor Law 604–90 (1971) (Supplements 1971 and 1972), a project of the Section of Labor Relations Law of the American Bar Association.

carpenters employed on the jobsite." 386 U.S. at 615–616, 87 S.Ct. at 1253. The Supreme Court held in a 5–4 decision that the contract clause was lawful because it was intended to protect and preserve work customarily performed by employees in the bargaining unit. The Court pointed out that Congress did not intend to obliterate the longstanding distinction between union pressures directed toward "primary" objectives and identical pressures aimed at "secondary" objectives. Id. at 620, 633–635, 87 S.Ct. 1250. According to the Court:

> The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees.

Id. at 645, 87 S.Ct. at 1268. Putting it another way, the test is

> whether, under all the surrounding circumstances, the Union's objective was preservation of work for [the employer's] employees, or whether the agreements . . . were tactically calculated to satisfy union objectives elsewhere.

Id. at 644, 87 S.Ct. at 1268. The Court surmised that such criteria would not always be simple to apply. Id. at 645, 87 S.Ct. 1250. Subsequent cases, cf. Journeymen Plumbers Local 636 v. NLRB, 139 U.S.App.D.C. 165, 430 F.2d 906 (1970); NLRB v. Milk Drivers Local 753, 392 F.2d 845 (7th Cir. 1968); A. Duie Pyle, Inc. v. NLRB, 383 F.2d 772 (3d Cir. 1967), cert. denied, 390 U.S. 905, 88 S.Ct. 819, 19 L.Ed.2d 871 (1968), and this litigation prove the prophecy correct.

The NMU clause here was in a sense aimed at the labor relations of the primary employer, since it required Commerce to provide for continuation of the collective bargaining agreement, if the ship were sold. On the other hand, the clause was also "addressed" to the labor relations of the secondary employer,[7] since it required Vantage to be or to become an NMU employer, to the extent of manning the Barbara. As to whether the clause was calculated to satisfy union objectives "elsewhere," it can fairly be said both that the NMU objective of making sure that the unit remained under the protection of the NMU agreement was not an objective "elsewhere," and that the union's aim to convert any prospective purchaser to an NMU contract was.

■ Despite the closeness of these competing arguments, we are persuaded that the Board's decision was correct. While the clause at issue here has aptly been described as introducing "a new twist to Section 8(e) litigation," The Developing Labor Law 107 (1971 Supp.), the established distinction between "union standards" and "union signatory" subcontracting clauses is analogous. The former, which restrict subcontracting to those who observe certain pay scales and conditions of employment, are valid. Painters District Council 48 v. NLRB, 117 U.S.App.D.C. 233, 328 F.2d 534 (1964); Kennedy v. Sheet Metal Workers Local 108, 289 F.Supp. 65, 78 (C.D.Cal.1968); Teamsters Local 386, 198 N.L.R.B. No. 129 (1972). The latter, which permit unit work to be transferred to other employers only if they are under contract with the union, are usually held illegal. NLRB v. Milk Drivers Local 753, 392 F.2d 845 (7th Cir. 1968); NLRB v. Teamsters Joint Council 38, 338 F.2d 23, 28 (9th Cir. 1964); Meat & Highway Drivers Local 710 v. NLRB, 118 U.S.App.D.C. 287, 335 F.2d 709, 717 (1964). But cf. NLRB v. Sheet Metal Workers Local 28, 380 F.2d 827 (2d Cir. 1967) (no violation of section 8(e), although clause was a union signatory clause on its face, where six-month period for initiating unfair labor practice charge on basis of clause itself

---

**7.** Indeed, as noted above, as a result of the NMU's efforts to enforce the clause, Vantage was confronted with the threat of a strike by the SIU on Vantage's own vessels.

had expired and where specific instance of application of clause did not involve impermissible secondary objectives).[8]

While the distinction between union standards and union signatory clauses may seem somewhat artificial,[9] in the ordinary situation it serves at least two purposes: First, under a union standards clause, the union cannot insist that the secondary employees be organized by one of *its* locals. Thus, a competing union that has established similar wage scales and working conditions cannot be discriminated against through a work standards clause. Second, the courts' insistence on union standards clauses makes it somewhat more likely that the union will not sacrifice the interests of employees in the primary unit in the hope of making gains on another front. To get a restrictive clause in the contract, the union may have to give up demands for other employee benefits. If the clause is a union signatory clause, the union has an interest, independent of the interests of the employees being represented, in furthering its own organizational ends or in protecting the interests of its other bargaining units. If the clause is a union standards clause, however, the union will have no guarantee that the prospective subcontracting firm's employees will be members of the union. Thus, the likelihood that the clause is designed to foster the interests of the primary employees is somewhat greater.

■■■ The union standards-union signatory distinction suggests enforce-

ment of the Board's order. We will assume without deciding that the NMU could legitimately have insisted that Commerce sell no ships unless union standards were preserved.[10] But for the NMU to bargain for a clause that gives it the right to continue manning the ship from its hiring hall goes beyond "work preservation" of the kind sanctioned in *National Woodwork* and the lower court cases in this area. The circumstances of the arrangement make it clear that the NMU's motivation was to protect the union's interest, rather than the interest of the work unit and its members. The practice of the shipping industry is for the purchaser's union to man newly-acquired vessels. This practice accords with the fleet-wide representation rule prescribed for the industry by the Board. Moore-McCormack Lines, Inc., 139 N.L.R.B. 796, 798–99 (1962). The NMU, of course, has no thought of abandoning its claims on any ships that are sold to an NMU company. Under the clause in this case, however, the NMU extends its claim to ships *leaving* NMU companies. If transfers of ships are, as the Board found, fairly common in the industry, this practice will result, eventually, in NMU representation of virtually all the American-flag vessels in the trade or if the SIU retaliates, in constant disruption of the sort experienced here. Despite the NMU's claims that it is merely attempting to avoid erosion of its place in a dying industry, the broader impact of its "work preservation" clause is to advance its own or-

---

8. Relying on *Sheet Metal Workers*, the NMU argues that even if Article I, section 2 is analogous to a union signatory clause, the Board's order is nonetheless erroneous because the clause was not illegally applied here. The argument has no merit; the NMU's efforts to enforce the clause have interfered with the labor relations of a neutral employer, inciting the SIU to threaten to strike all Vantage ships. See note 6 supra.

9. See Note, A Rational Approach to Secondary Boycotts and Work Preservation, 57 Va.L.Rev. 1280, 1293 (1971).

10. Since the union standards-union signatory distinction was developed largely in cases in-

volving subcontracting, it is arguably inapposite here. Commerce's sale of its last ship might be compared to an employer's decision to close his factory and terminate his business altogether. But the Supreme Court has noted that the decision to terminate business is peculiarly a matter of management prerogative, Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 270, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), and we cannot conceive that a union would be entitled to seek more far-reaching job protection in that situation than in the ordinary subcontracting case.

ganizational goals at the expense of the SIU. Clear anti-SIU motivation appears in the record in this case and was quoted in this court's decision in National Maritime Union v. Commerce Tankers Corp., supra, 457 F.2d at 1127, 1130 n. 3.[11] See also McLeod v. National Maritime Union, 457 F.2d 490 (2d Cir. 1972); National Maritime Union, 174 N.L.R.B. 216 (1969). Not surprisingly, the cases indicate that such an objective is not protected as primary. See NLRB v. Operating Engineers Local 825, 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971); NLRB v. Milk Drivers' Local 753, 392 F.2d 845, 848 (7th Cir. 1968); cf. NLRB v. Sheet Metal Workers Local 28, 380 F.2d 827, 831 (2d Cir. 1967) (absence of anti-rival union animus cited as one basis for concluding respondent union did not violate section 8(e)). Indeed, the elimination of inter-union rivalry with respect to employees of the same employer and the consequent diminution of conflicts which may result in work stoppages are among the principal goals which the Board seeks to attain through implementation of its fleet-wide representation rule. Moore-McCormack Lines, Inc., supra, 139 N.L.R.B. at 798–99.

A second relevant factor is that it is the NMU's practice to remove all the seamen from a ship whenever the ship is sold. Therefore, the men working on the Commerce vessel will lose their jobs regardless of which union gains control of the ship.[12] The only difference will be that under the NMU contract, the jobs will be available to seamen with seniority in the NMU hiring hall, while under an SIU contract the SIU hiring hall will be used. Thus, the benefi-

ciaries of the union's clause will not be those members now employed on the vessel, but the union as a whole. True, the NMU emphasizes that the Board assumed without deciding that the bargaining unit for Commerce employees could include seamen who may in the future be referred from the NMU hiring hall to Commerce. Interpreting this to mean that the Commerce bargaining unit could include all those entitled at any time to use of the NMU hiring hall, the NMU argues that the clause is clearly lawful because prior case law establishes that a contractual provision designed to preserve work for employees in the bargaining unit is valid. We cannot accept this argument. While the cases may use the bargaining unit as a yardstick for the permissible scope of a work preservation clause, we are aware of none that do so where, as here, the suggested bargaining unit is many times larger than the actual work force of the primary employer and where the vast majority of the workers in the supposed unit have had no contact at all with the employer. Moreover, as the Board urges, if the NMU's argument were correct, Congress would have had no reason to enact the proviso to section 8(e) which validates union signatory agreements with respect to job site work in the construction industry,[13] since the hiring hall, upon which NMU's argument is based, is apparently the central source of employment in the construction industry, Teamsters Local 357 v. NLRB, 365 U.S. 667, 672–673, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), as it is in the maritime industry.

Petition for enforcement granted.

---

11. This decision contains language which, at first glance, may appear to settle the issue of the legality of Article I, section 2, but we there held only that the Regional Director had "reasonable cause to believe" that the clause violated § 8(e).

12. When the S.S. Thalia was sold to an NMU-affiliated employer, all of the ship's unlicensed seamen were removed from their jobs and replaced through the NMU hiring hall.

13. The "construction industry" proviso to § 8(e) reads:

Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work . . .

29 U.S.C. § 158(e).