Sidney DANIELSON, Regional Director, Region 2 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner-Appellee,

v.

INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS, AFL–CIO, Respondent-Appellant.

No. 842, Docket 75–7062.

United States Court of Appeals, Second Circuit.

Argued April 2, 1975.

Decided May 30, 1975.

748

Seymour M. Waldman, New York City (Waldman & Waldman, Marvin, Schwartz, New York City, of counsel), for respondent-appellant.

Joseph M. Sharnoff, Supervisory Atty., N.L.R.B., Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Gerald Brissman, Associate Gen. Counsel, Frank H. Parlier, Asst. Gen. Counsel, Charles I. Cohen, Supervisory Atty., N.L.R.B., Washington, D. C., of counsel), for petitioner-appellee.

Martin C. Seham, New York City (Andrew E. Zelman, Fred C. Klein, Surrey, Karasik, Morse & Seham, New York City, of counsel), for amicus curiae Seatrain Lines, Inc.

Before ANDERSON, MANSFIELD and OAKES, *Circuit Judges.*

MANSFIELD, *Circuit Judge:*

The International Organization of Masters, Mates and Pilots ("MM&P" or "the Union") appeals from a preliminary injunction restraining it from seeking to arbitrate or otherwise enforce a provision in its collective bargaining agreement with Seatrain Lines, Inc. ("Seatrain"), obligating Seatrain, as condition precedent to sale or transfer of a vessel, to insure that the transferee will bind itself to MM&P's collective bargaining agreement. The injunction granted below was sought, pursuant to § 10(*l*) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(*l*),[1] by plaintiff Danielson, Regional Director of the National Labor Relations Board ("the Board") and was based on a charge filed

---

1. Section 10(*l*) provides in part:

   "(1) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: . . . .."

with the Board by Seatrain on October 1, 1974, alleging that MM&P's attempt to enforce this provision constituted an unfair labor practice in violation of § 8(e) of the Act, 29 U.S.C. § 158(e),[2] the so-called "hot cargo" provision. The Board, after investigation, concluded that there was reasonable cause to believe that MM&P was engaging in the unfair labor practice charged and accordingly sought relief under § 10(*l*) pending final disposition of the charge by the Board. After a hearing on December 6 and 9, 1974, Judge Motley of the Southern District of New York found that the Regional Director had shown reasonable grounds to believe that the Union was engaged in the charged unfair labor practice and granted the injunctive relief. We affirm.

Seatrain, a Delaware corporation based in New York, is engaged through subsidiaries in operating, owning and constructing seagoing vessels. One of the wholly-owned subsidiaries is Seatrain Shipbuilding Corp. ("Shipbuilding"), a corporation engaged in the business of building and selling ships. Shipbuilding began operations in 1969 and has engaged in the construction of four vessels, at least one of which has been completed.

Shipbuilding's first vessel, the T/T Brooklyn, was constructed pursuant to a construction contract by Langfitt Shipping Corp., another Seatrain subsidiary. On December 31, 1973, the Brooklyn was sold to Wilmington Trust Company as agent for General Electric Credit Corporation ("GECC"). Wilmington concurrently bareboat-chartered (i.e., chartered without crew) the Brooklyn to East River Steamship Corp., which entered into a management agreement with Anndep Shipping Corp. Finally, Anndep entered into an agreement with Westchester Marine Shipping Co. ("Westchester"), a labor contractor, which undertook to supply the crew for the Brooklyn.

Shipbuilding's second vessel, the T/T Williamsburg, was constructed under a construction contract held by another Seatrain subsidiary, Tyler Tanker Corp. Seatrain has obtained from GECC a commitment letter to purchase this vessel and GECC intends to bareboat-charter the vessel to Kingsway Tankers, Inc. Kingsway also has a management agreement with Anndep Corp., and thus Westchester will also supply the crew of the Williamsburg.

This case arises because Westchester entered into a collective bargaining agreement with MM&P's rival union, Marine Engineers Beneficial Association, District 2, and through that organization it has hired some 28 licensed deck officers for the Brooklyn and has begun hiring to the Williamsburg. The MM&P had a collective bargaining agreement with Seatrain and its affiliates and subsidiaries, in effect from June 16, 1972 to June 15, 1975, which covered the licensed deck officers of all U.S.-flag vessels owned, operated, or bareboat chartered by Seatrain and contained the following provisions:

> "*Section V.* VESSELS BOUND BY THE AGREEMENT
>
> "2. *Sales and Transfers*
>
> "a. With regard to any sale, charter (but not including a vessel which the Company may be operating under a bareboat charter and the charter is terminated) or any manner of transfer (except sales to foreign flag) of the Company's vessel:
>
> "i. At least seventy-two (72) hours prior to the date of the effective

---

**2.** Section 8(e) provides in part:

"(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: . . .."

transfer of the vessel, written notice must be given to the Organization by the Company.

"ii. The execution by the purchaser, charterer or transferee of the Organization's collective bargaining agreement shall be a condition precedent to any sale, charter or transfer.

"iii. If the Company violates subsection 2(a)(ii) above, the Arbitrator may include as part of his award, loss of wages and contributions to the various Organization Plans.

"iv. A violation of subsection 2(a)(ii) above shall also permit the Organization to cancel the no-strike provisions of this Agreement."

When it agreed to sell the Brooklyn and the Williamsburg, Seatrain did not require the transferees to execute MM&P's collective bargaining agreement as required by § 2(a)(ii).

On April 17, 1974, MM&P notified Seatrain that it was placing on the agenda for arbitration[3] a grievance arising from "the failure to man the SS. BROOKLYN with IOMM&P licensed deck officers employed under [the] agreement." On September 18, 1974, MM&P advised that it was placing on the arbitration agenda a grievance arising from the "failure to secure the manning of the T/T Williamsburg with IOMM&P Licensed Deck Officers" and specifically informed Seatrain that it was seeking relief consisting of: "1. The manning of the T/T Williamsburg by IOMM&P Licensed Deck Officers" and "2. The lost wages, including overtime, and the contributions to the various Organization Plans for the period of time that the T/T Williamsburg was, is and remains manned by licensed officers other than IOMM&P Licensed Deck Officers. . . ." On April 22, 1974, Seatrain brought an action in the Supreme Court of New York seeking to enjoin MM&P from pressing its arbitration claims. The action was removed to the Southern District where MM&P cross-applied for an order compelling ar-

bitration. Both the motion to compel and the motion to stay arbitration were denied as moot after the district court granted the § 10(*l*) injunction sought by the Board in the present proceeding.

In the court below, and again on appeal, the Union argues that subdivision 2 of Section V of the agreement does not violate § 8(e) of the Act because it is merely a "work preservation" provision, and that in any event the Union had an absolute right to seek arbitration of its grievances. Thus appellants urge that there was no reasonable cause to believe that an unfair labor practice charge will ultimately be sustained, and thus the § 10(*l*) injunction should not have issued.

## DISCUSSION

In determining whether an injunction under §10(*l*) should issue, it is well settled that the district court need not decide that an unfair labor practice has actually occurred but merely must decide whether the Board has reasonable cause to believe there has been a violation of the Act. *Douds* v. *Milk Drivers & Dairy Employees Union*, 248 F.2d 534, 537–38 (2d Cir. 1957). The district court should defer to the statutory construction urged by the Board. See *McLeod* v. *National Maritime Union*, 457 F.2d 490, 494 (2d Cir. 1972). When there are disputed issues of fact, the Regional Director is entitled to assume facts and draw inferences in favor of the charging party, and, as long as his choice is rationally based and the court is not convinced that the Board's legal position is wrong, the court must sustain those findings and grant injunctive relief. *Danielson* v. *Joint Board*, 494 F.2d 1230, 1245 (2d Cir. 1974). Bearing these standards in mind, we have little difficulty concluding that the district court reached the correct result.

At the hearing below, appellants urged that subdivision 2 of Section V must be upheld as a means of preserving existing work in the bargaining unit, see

---

**3.** Section XXXVI of the contract provided for arbitration of all disputes relating to the interpretation or performance of the agreement.

*National Woodwork Mfrs. Ass'n* v. *NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967);[4] *Meat & Highway Drivers* v. *NLRB,* 118 U.S.App.D.C. 287, 335 F.2d 709 (1964), its "thrust" being "toward the jobs of Seatrain's own licensed deck officers or at least jobs fairly claimable for them." The Union thus in effect contends that since Seatrain has agreed to have all its vessels manned by MM&P, the ships owned by Seatrain at any time represent the measure of the work which the Union is entitled to "preserve," and the Union can thus legally cause the job to "run with the ship" at least as long as direct pressure is exerted only against Seatrain.

As recognized by the district court, we rejected an almost identical argument only a year and a half ago in *NLRB* v. *National Maritime Union (Commerce Tankers),* 486 F.2d 907 (2d Cir. 1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). In that case the labor agreement also obligated the employer, upon selling a ship, to obtain from the transferee an agreement with the NMU to be bound by the union's collective bargaining agreement. Following sales by the employer of a vessel, the Union had obtained an arbitration award restraining the employer from delivering the vessel to the transferee without the contractual commitment. We upheld a Board determination that the Union's activities violated § 8(e).

In *Commerce Tankers,* while recognizing that the challenged contract provision had some elements of "work preser-

vation" since it merely required continuation of existing union jobs after the ships were sold, we nonetheless concluded that the objective of the clause was to influence the labor relations of a secondary employer, since it required the transferee to use the transferor's union, at least to the extent of manning the transferred vessel. We took into account the accepted distinction between "union standards" clauses, which are valid, see, e.g., *Orange Belt District Council of Painters No. 48* v. *NLRB,* 117 U.S.App.D.C. 233, 328 F.2d 534, 538–39 (1964), and invalid "union signatory" clauses, which permit the employer to transfer work to other employers only if they are under contract with the union, see, e.g., *NLRB* v. *Milk Drivers Local 753,* 392 F.2d 845 (7th Cir. 1968), but concluded that the NMU's clause partook more of the attributes of the latter than of the former.

Here the district court correctly concluded that our decision in *Commerce Tankers* controls the present case. Indeed, in *Commerce Tankers* the union had an even stronger "work preservation" claim, since in that case union members had previously held jobs on the transferred vessel. Here, by contrast, no MM&P members have ever been employed on the Brooklyn or the Williamsburg, and thus the Union is forced to rely almost exclusively on the argument that its agreements with various employers allow it to "protect" a pool of jobs for its hiring hall, a position clearly rejected by the *Commerce Tankers* Court. See 486 F.2d at 913.[5] As we there point-

---

**4.** In *National Woodwork,* the Supreme Court recognized that § 8(e) is not directed at union activity which is solely primary in objective, that is, directed to the protection of work of employees in the bargaining unit. The test of legality under § 8(e) is

"whether, under all the surrounding circumstances, the Union's objective was preservation of work for [the employer's] employees, or whether the agreements . . . were tactically calculated to satisfy union objectives elsewhere.". *National Woodwork,* 386 U.S. at 644, 87 S.Ct. at 1268.

**5.** The Union makes several other related arguments. First, it offers to prove that Seatrain

retired or sold several other vessels in order to finance construction of the Brooklyn and the Williamsburg and therefore jobs on those vessels are "fairly claimable" by MM&P personnel. This argument merely states differently the rejected proposition that MM&P is entitled to a fixed number of jobs for its hiring hall, and that therefore jobs on the Brooklyn and the Williamsburg are "claimable" even though they are now with a different primary employer.

The Union further notes that in *Commerce Tankers* the NMU agreement provided that on sale of a vessel, even to an NMU company, all employees would be replaced by new assignees from the NMU hiring hall. This fact fur-

ed out, allowing one union to protect a fixed number of jobs for its hiring hall by such agreements would either result in one union taking over representation of all American flag vessels or more likely would result in conflict with other unions which are likewise attempting to retain *their* positions. *Id.*

None of the Union's efforts to distinguish *Commerce Tankers* are persuasive. The MM&P observed that unlike *Commerce Tankers*, where the transferee was already committed to another union which threatened to strike if the transferee employer gave in to NMU pressure, here Westchester Marine did not have a contract binding it to a certain union with respect to the manning of the two vessels.[6] However, the existence of an immediate animus against a rival union was cited by us in *Commerce Tankers* merely as one factor demonstrating that the union's "work preservation" clause would advance the union's own organizational goals at the expense of a rival union. The secondary impact of the Union's action is not lessened by the fact that the clause is aimed at other maritime unions in general rather than one in particular. The probability of inter-union conflict nonetheless remains.

The Union further argues that in *Commerce Tankers* a final arbitration award prevented sale of the ship, resulting in its immobilization, whereas here the Union has not interfered with the sale of the vessels but only seeks damages for Seatrain's disposition of them without compliance with Section V(2).

Thus, the Union contends, it did not force Seatrain "to cease doing business with any other person." This argument was properly rejected. In the first place the Union in its April 17 letter asserted as a grievance "the failure to man the SS. BROOKLYN with IOMM&P licensed deck officers," and demanded in its September 18 letter relief consisting of "the manning of the T/T Williamsburg by IOMM&P Licensed Deck Officers." From this it may be inferred that the Union expected that either the arbitrator or Seatrain might pressure the transferee employers to comply. Secondly, the obvious purpose of the damage provision is to coerce Seatrain to sell vessels only to a transferee willing to sign up with the Union. The contract does not provide Seatrain with a reasonable alternative (e.g., payment of a fixed sum) that would permit it to sell a vessel without compliance with section V(2)(a)(ii). That section is mandatory. Paragraph (a)(iii), furthermore, states that in case of violation the arbitrator "may include as *part* of his award, loss of wages and contributions. . . ." As damages the Union here seeks "lost wages and contributions . . . for the period of time the T/T Williamsburg *was, is* and *remains*" manned by non-MM&P personnel, sums which will continue to mount as long as MM&P officers are not aboard the vessels. Thus the Union's damage demands were merely part of a larger objective of assuring that Seatrain would not sell vessels to persons who refused to sign labor contracts with MM&P.[7]

thered the court's conclusion that the union's objective was not to protect the jobs of men aboard the transferred ships, but the union's general organizational interest in obtaining jobs for its hiring hall. Here, MM&P points out that under its agreement the second and third officers have job protection for their full 180-day periods of hiring regardless of ship ownership, and firing of Masters and Chief Officers is discretionary with the new owner. We need not decide, however, whether the Union might legitimately use section V(2) to protect the jobs of employees already on ship board for the duration of their regular tour of duty. The argument is irrelevant here where no MM&P members have ever been employed

on the Brooklyn or the Williamsburg, and the clause, as in *Commerce Tankers*, is being used to create new jobs for persons in the MM&P who have no prior association with the vessel.

**6.** Westchester Marine had, however, apparently dealt extensively, if not exclusively, with the Maritime Engineers Benevolent Association prior to the making of the agreements for the Brooklyn and Williamsburg.

**7.** Section 8(e) prohibits hot cargo agreements whether "express or implied" and thus the requirement of a complete cessation of business with another person is not necessary to come within the prohibition. Where under the

■ The Union next contends that the § 10(*l*) injunction should not have issued since all the Union was seeking here was arbitration of its grievances, and it had an absolute right to seek arbitration. First, the Union claims that the demand for arbitration does not constitute "reaffirmation" of the challenged contract clause. Such "reaffirmation" is necessary here since § 8(e) forbids only the "entering into" of a hot cargo contract and the contract here was originally entered into more than six months before the filing of the unfair labor practice charge. Thus challenge to the alleged "hot cargo" provision on its face is barred by the six-month statute of limitations provided in § 10(b) of the Act, 29 U.S.C. § 160(b). *NLRB* v. *Local 28, Sheet Metal Workers*, 380 F.2d 827, 829 (2d Cir. 1967). A union may, however, "reaffirm" the clause by later seeking its enforcement [8] but the Court in *Sheet Metal Workers* added that the Board could find an unlawful reaffirmation "only if the circumstances in which the union sought enforcement of the clause amounted to an attempt to control 'hot cargo' in a manner itself forbidden by the Act." 380 F.2d at 830. Thus, the court must examine the actual circumstances in which the union attempts to apply the clause. The Union here cannot escape under this rule since, as discussed earlier, there is good cause to believe that the MM&P's demand to place its members on the vessels of Seatrain's transferees is itself a violation of § 8(e). That the demand for enforcement is by way of a demand for arbitration does not affect the conclusion that the Union has reaffirmed the clause.

Second, the Union contends that the Board would not enter an enforceable order in this case, because under the doctrine established by *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971), the Board would decline jurisdiction and defer to the arbitration procedures which have here been invoked. The Union relies on recent general approval by the Supreme Court of the *Collyer* doctrine, see *William E. Arnold Co.* v. *Carpenters District Council*, 417 U.S. 12, 16–17, 94 S.Ct. 2069, 40 L.Ed.2d 620 (1974), and dicta of this Court in *United Optical Workers* v. *Sterling Optical Co.*, 500 F.2d 220 (2d Cir. 1974), in which we stated that, were the issue before us, we would have determined that the district court erred in declaring void a section of a contract "since the validity of [the provision] under section 8(e) is an issue lying initially in the exclusive province of the arbitrator." 500 F.2d at 224.

We reject the argument that deferral to arbitration is necessarily appropriate here. This is not a case in which one party to a labor contract alleges that the other has engaged in conduct which both violates the labor agreement and arguably constitutes an unfair labor practice. In such a case there is good reason to defer to arbitration since the arbitrator is likely to resolve both the unfair labor practice and the breach of contract claims "in a manner compatible with the purposes of the Act." *Eastman Broadcasting Co.*, 199 N.L.R.B. 434, 437 (1972).

■ Here, on the other hand, the claim is that the Union's effort to en-

agreement the business, such as the sale of a ship, can be transacted only under extremely onerous conditions, here the payment of damages, the agreement "impliedly" prohibits the "doing of business with another person." See *Amalgamated Lithographers Local 19*, 130 N.L.R.B. 985, 987–88 (1961), *enf'd in pertinent part*, 309 F.2d 31 (9th Cir. 1962), *cert. denied*, 372 U.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963).

**8.** The appellant's contention that there must be *compliance* as well as a demand for compliance before a clause which violates § 8(e) can be deemed reaffirmed is perplexing, since it

would require an employer seeking to challenge a hot cargo provision first to acquiesce in the demand. This is hardly in line with the language of the section which states that the agreement shall be "unenforceable and void." In any event, appellant's suggestion is not the law. *NLRB* v. *Electrical Workers*, 405 F.2d 159, 164 (9th Cir. 1968), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969); *NLRB* v. *Milk Wagon Drivers Union*, 335 F.2d 326 (7th Cir. 1964); *Los Angeles Mailers Union No. 9* v. *NLRB*, 114 U.S.App.D.C. 72, 311 F.2d 121, 123 (1962); see *NLRB* v. *Local 28, Sheet Metal Workers, supra*.

force an illegal contract provision itself constitutes the alleged unfair labor practice.

> "Deferral is not appropriate in a dispute where the contract provisions governing the dispute are as here unlawful on their face or by their express terms call for a result inconsistent with Board policy under the Act." *International Union of Operating Engineers, Local 701,* 216 N.L.R.B. No. 45 at 4 (1975).

Where a contract clause calls for a result inconsistent with the Act and the jurisdiction of an arbitrator provided for by the contract is restricted, as here, to "disputes relating to the *interpretation* or *performance* of this Agreement" (emphasis added), resort to arbitration may be futile since it is not at all clear that the arbitrator may disregard the plain provisions of the contract. See *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 352 (1960). Furthermore, where the issue between the parties is the validity of a contract provision under the requirements of the NLRA, the Board possesses greater expertise to decide the question than does an arbitrator. Finally, § 10(*l*) directs the NLRB Regional Director to seek injunctive relief if he has reasonable cause to believe that the charge of violation of § 8(e) is true,[9] and where a clause is found to violate § 8(e)

> "it is unenforcible and void, it should not and cannot form the basis for any arbitration award, irrespective of the holding of the arbitrator, and the mere submission of the controversy to arbitration would compound the statutory

violation." *McLeod* v. *American Fed. of Television & Radio Artists,* 234 F.Supp. 832, 841 (S.D.N.Y.1964), *aff'd on the district court opinion,* 351 F.2d 310 (2d Cir. 1965).

Thus, there is good reason to believe that resort to arbitration would be inappropriate in this case.

The Union belatedly suggests that section V(2) may be saved by reading its coverage as limited to subsidiaries or affiliates to which the agreement is made applicable by subdivision 1 of section V,[10] and urges that the arbitration should be allowed to proceed at least to determine whether any of the transferee owners, managers, or bareboat charterers of the Brooklyn and Williamsburg are subsidiaries or affiliates of Seatrain. The Union, however, never made this contention to the district court. Indeed, although the Board introduced testimony that each transferee had no corporate connection to Seatrain, the Union offered no contrary proof and, when asked by the Court whether the Union was contending that Seatrain had sold not to an independent company but to a subsidiary, the Union's counsel answered flatly, "No, I make no such contention." Against this background the Union's belated contention must be disregarded as an unsupportable afterthought.

■ The Union finally advances several other arguments which the district court properly resolved against it. First, the Union argued that the sales of vessels by Seatrain Shipbuilding did not constitute "doing business" within the meaning of § 8(e). While in *Commerce*

---

9. This power explicitly given to the NLRB distinguishes this case from a case such as *United Optical Workers, supra,* where the suit was brought by employees under § 301(a) to compel arbitration. There the question was whether the arbitrator or the district court should have jurisdiction; here, as between the arbitrator and the NLRB, the Board has a statutory directive to act. See *McLeod* v. *American Fed. of Television & Radio Artists,* 234 F.Supp. 832, 840–42 (S.D.N.Y.1964), *aff'd on the district court opinion,* 351 F.2d 310 (2d Cir. 1965).

10. Section V, subdivision 1, provides:

"a. *Vessel Coverage.* This agreement covers the Licensed Deck Officers employed on oceangoing U.S.-flag vessels, owned, operated, or bareboat chartered (both at present or at any time during the life of this Agreement) by the Company or by any of its subsidiaries or affiliates (whether so at present or at any time during the life of the Agreement) as owner, agent, operator or bareboat charterer."

*Tankers* we expressed doubt as to whether an isolated sale by a shipping company of a capital item such as a ship constituted "doing business," see 486 F.2d at 911, there was evidence here that Seatrain Shipbuilding was engaged in and intended to continue the business of building and selling seagoing vessels. This evidence of doing business was adequate for the purpose of determining whether a § 10(*l*) injunction should issue. *See also* note 7, *supra.*

Second, the Union urges that the "real party in interest" to the labor agreement here in question is MM&P's Offshore Division which consists solely of supervisory personnel and is therefore not a "labor organization" bound by the requirements of § 8(e). The simple and complete answer is that the party to the agreement here is not the Offshore Division but the MM&P itself, which is clearly a "labor organization," see *International Org. of Masters, Mates & Pilots,* 197 N.L.R.B. No. 69, *enf'd,* 159 U.S.App. D.C. 11, 486 F.2d 1271 (1973), *cert. denied,* 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974). Thus the agreement is within the plain language of § 8(e), which proscribes the making of a "hot cargo" agreement by "any labor organization and any employer."

Seatrain has demonstrated a sufficient likelihood of success on the merits and of harm pending final adjudication to warrant the injunction granted here. The Union's continued demands for damages limit Seatrain's ability to negotiate the sale of ships free of the requirement that purchasers enter into the restrictive labor agreements.[11] Seatrain is entitled to interim removal of this continuing cloud on its future sales. Of course "[t]he Board is free to render whatever decision it deems proper in the unfair labor practice proceeding, and to give this opinion whatever weight it chooses. . . . " *Danielson* v. *Joint Board,* 494 F.2d 1230, 1245 (2d Cir. 1974).[12]

Judgment affirmed.

---

11. We do note, however, that Judge Motley's finding that the Union's efforts here "would in effect prevent consummation or substantially interfere with sales of Seatrain's ships (the T/T Brooklyn and T/T Williamsburg)" was erroneous inasmuch as the sales of those two vessels appeared to be complete.

12. Since argument of this appeal an Administrative Law Judge of the NLRB found that the MM&P's conduct in entering into and enforcing Article V, Sec. 2 of the collective bargaining agreement with Seatrain violated § 8(e) and recommended that a cease and desist order be issued. The case is now on appeal to the Board.