392 F.2d 845
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
MILK DRIVERS' UNION, LOCAL NO. 753, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, and Associated Milk Dealers, Inc., and Various of Its Employer Members, Respondents, and
Korth Transportation Company, Intervenor.
 No. 16005.
 United States Court of Appeals Seventh Circuit.
 January 11, 1968.
 Rehearing Denied April 29, 1968.
 
 Marcel Mallet-Prevost, Asst. General Counsel, Gary Green, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Gary Green, Linda Sher, Atty., N.L.R.B., for petitioner N.L.R.B.
 Joseph A. Melli, Robert W. Smith, John P. McCrory, Madison, Wis., for intervenor.
 John B. Swern, William T. Kirby, John Paul Stevens, Donald E. Egan, Joseph M. Jacobs, Charles J. Griffin, Jr., Fred C. Nonnamaker, Jr., Chicago, Ill., for respondent Milk Drivers' Union, Local No. 753. Jacobs & Gore, Chicago, Ill., of counsel.
 Before HASTINGS, Chief Judge, and CASTLE and SWYGERT, Circuit Judges.
 CASTLE, Circuit Judge.
 
 
 1
 This case is before the Court upon the petition of the National Labor Relations Board to enforce an order of the Board issued on June 27, 1966, against the respondent Union[1] and the respondents Associated Milk Dealers, Inc., and certain of Associated's member dairies. The Board's decision and order are reported at 159 NLRB No. 128.
 
 
 2
 The Board found and concluded that the Union, Associated and the dairies violated Section 8(e) of the Act[2] by entering into an agreement prohibiting the dairies from utilizing the services of independent over-the-road haulers, not under a collective bargaining contract with Local 753, for the transportation of raw milk to the processing dairies. The Board's order requires the respondents to cease and refrain from giving effect to the agreement insofar as it violates Section 8(e) and to post designated notices.
 
 
 3
 The record discloses that Local 753 represents for purposes of collective bargaining transportation workers in the dairy industry in the metropolitan Chicago area whose transportation equipment is garaged or based in the Chicago metropolitan area. The territorial limitation on the jurisdiction of Local 753 is imposed by the International Teamsters Union. Drivers operating in the metropolitan Chicago milk industry whose equipment is based elsewhere are not subject to the jurisdiction of Local 753. A number of haulers who transport raw milk from Wisconsin to dairies in the metropolitan Chicago area are independent contractors who use their own equipment, operated by their own employees, and are parties to collective bargaining agreements with Wisconsin Locals of the International Teamsters Union.[3] Other independent over-the-road haulers engaged in the transportation of raw milk from country sources to the processor-dairies, and whose equipment is garaged in the Chicago metropolitan area, have collective bargaining agreements with Local 753 and their employees are members of Local 753. All but two of the approximately 28 dairies involved were using independent haulers rather than their own employees to bring their raw milk supply to their plants. These two dairies had but 15 employees engaged in the transportation of raw milk while the independent haulers who do the bulk of the industry's raw milk haulage had over 100 employees so engaged. For the past thirty years at least, independent haulers have done the bulk of the transportation of raw milk from country sources in the Chicago metropolitan area milk industry. And, as above indicated, not all of the dairies use haulers of raw milk whose equipment is garaged or based in the Chicago metropolitan area and whose employees are members of Local 753.
 
 
 4
 Following contract negotiations in 1964 between Local 753 and Associated, who represented its member dairies, the respondent dairies during May 1964 executed collective bargaining agreements with Local 753 which in Article 43-B provide:
 
 
 5
 "* * * All Dealers must employ members of Local 753 to operate the transportation equipment. The final date for full compliance shall be August 15, 1964." The term "dealers" is used in the agreements as descriptive of the signatory dairies.[4]
 
 
 6
 The issue presented for our determination on review is whether substantial evidence on the record considered as a whole supports the Board's determination that the object of Article 43-B was to prohibit the dairies from dealing with the independent haulers whose employees are members of the Wisconsin locals, and therefore was a violation of Section 8(e).
 
 
 7
 If the Board's factual findings are so supported its conclusion that the contract clause violated Section 8(e) as a form of secondary boycott is correct. National Woodwork Mfrs. Ass'n v. N.L. R.B., 386 U.S. 612, 87 S.Ct. 1250, 18 L. Ed.2d 357; Cf. N.L.R.B. v. Milk Wagon Drivers' Union Local 753, 7 Cir., 335 F.2d 326, 328-329. In the latter case this Court said:
 
 
 8
 "The record as we decide gives substantial support to the Board's findings of the Union's unlawful objectives — to forbid contracting out of hauling except to employers whose employees were members of Local 753, and to compel Wanzer [a dairy] to disrupt an existing business relationship with PMA [a milk supplier] because Quality's [a Wisconsin hauler] drivers were not members of Local 753."
 
 
 9
 The Union contends that the record properly appraised and evaluated does not support the Board's finding as to the objective of Article 43-B. In this connection the Union urges that the objective of the clause was merely to prohibit the contracting out of the over-the-road hauling and thereby to require the dairies to use their own employees, the bargaining unit represented by Local 753, for such purpose, and that such objective is a legitimate goal of collective bargaining.
 
 
 10
 The record reflects that the Board's findings with respect to the objective of Article 43-B were not arrived at merely by reference to its express language. It was observed that the provisions "cannot be read in a vacuum". The Board's determination of the objective of the clause was based on a combination of factors, including the context of the circumstances leading up to the Union's demand for such clause, the labor relations history of the subject, representations made by the Union's officials and agents concerning the effect of the clause, and the consequences of viewing the clause as a total ban on contracting out of over-the-road hauling on the segment of Local 753's membership currently so employed by independent haulers.
 
 
 11
 The Union, on the basis of the contract's union security clause, equates the expression "members of Local 753" used in Article 43-B with "employees" of the signatory dairy and interprets the clause as imposing merely a total ban on the contracting out of the hauling. But consideration of the body of the evidence relating to the factors above mentioned negates a conclusion that such was the objective of the clause or that it was intended to do other than eliminate the limiting effect, numerically, on Local 753's potential source of prospective members resulting from the operation of the Wisconsin-based independent haulers,[5] i. e., to require the dairies to cease utilizing the services of independent haulers whose employees were not members of Local 753.
 
 
 12
 There is evidence that, at least since the early 1950's, Local 753 was concerned over the fact that the northern (Wisconsin) locals rather than it represented employees of a number of independent haulers serving Chicago area dairies. Local 753 considered that these employees, engaged in the transportation of raw milk to Chicago area dairies, should be members of Local 753. William McNulty, president of Local 753, testified, in this respect, that, "[i]f our International would have allowed us to we would have had all of those people in our Union". In 1957, under the auspices of the International, Local 753 and the Wisconsin locals entered into a "treaty" under which it was agreed that where operations of employees represented by northern locals extended into Local 753's geographical jurisdiction, the applicable employee benefits would be those of Local 753 or of the involved northern local, whichever were greater; that transfer of the union membership of employees in the Wisconsin locals be made to Local 753 according to a specified ratio; and that independent haulers (Milk Tank Truck operators) operating in, or into the Chicago area be signators to both Chicago and Wisconsin agreements. But the "treaty" apparently failed to effect a solution satisfactory to Local 753. In any event, during negotiations preceding the 1961 collective bargaining agreement between Local 753 and the dairies, Thomas Haggerty, secretary-treasurer of Local 753, referred to the problem in a discussion with Thomas Gilmore, attorney for Associated and chief negotiator for the dairies, and stated he wanted a contract clause "in order to get these jobs that these northern locals had". In this, and in subsequent discussions in later years between representatives of Local 753 and representatives of Associated and the dairies, the latter took the position that the matter was a dispute between sister locals which should be settled by the International. Nevertheless, Associated and the dairies acceded to clauses addressed to the problem, although somewhat obliquely, in both the 1961 and 1963 agreements with the Union.[6] At the first meeting for negotiation of a 1964 contract Haggerty submitted proposals for changes, including a proposal to replace Article 44 of the 1963 contract with the following provision:
 
 
 13
 "All dealers must employ members of Local 753 to operate their equipment."
 
 
 14
 No formal discussion of what would be required by the proposed clause took place during the negotiation sessions. Haggerty did assert, however, that Article 44 had not accomplished its objective, and the new provision was necessary to "take care of the transportation situation". Midway through the negotiations, the Union, sua sponte, changed the language of the proposed clause to substitute "the transportation equipment" for "their equipment",[7] and in the final meeting added the provision suspending compliance until August 15, 1964. Gilmore was advised by Haggerty that the clause was a "must". The dairies acceded thereto, and thus the Union's latest effort addressed to what it considered to be the "problem" resulting from the representation of employees serving Chicago area dairies by the Wisconsin locals rather than by Local 753, culminated in agreements incorporating Article 43-B.
 
 
 15
 There is evidence that after the negotiations were concluded McNulty inquired of one of the dairies served by an independent hauler whose employees were members of a Wisconsin local if arrangements had been made for the hauling to be done by "753 personnel" and warned that the time was short. When an independent hauler whose employees were represented by Local 753 expressed concern about the effect of Article 43-B to the Local's business agent, Francis Gorney, the latter advised the hauler that the Article would have no effect on it because the hauler was "Local 753 in good standing". Haggerty advised another independent hauler whose employees were represented by Local 753 that if he had any idle equipment he should contact dairies and solicit hauling because there would be plenty of such work available after August 15.
 
 
 16
 Thus, in the light of the record, the Union's attempt to interpret Article 43-B as merely a prohibition on the contracting out of the over-the-road hauling does not square with the Union's expressed objective and its activities with respect to the subject matter. In the area here involved the record reflects a concern of Local 753 in increasing its membership at the expense of the Wisconsin locals rather than the protection of the work opportunities of its bargaining unit — a concern with membership, not jobs. And the Union's interpretation of the effect of Article 43-B on the independent haulers with which the Union had collective bargaining agreements was wholly inconsistent with an interpretation of the clause as imposing a total ban on the contracting out of over-the-road hauling by the dairies. The Union indicated it would be satisfied if the hauling were performed by "members of Local 753" irrespective of whether they were employees of the dairies or employees of independent haulers.
 
 
 17
 Moreover, the immediate effect of Article 43-B if it be regarded as prohibiting the contracting out of the over-the-road hauling would be at odds with its alleged goal of job protection. If Article 43-B requires dairies to use only their own employees for such hauling, then some 50 members of the unit — the employees of the Local 753 independent haulers — would be adversely affected.
 
 
 18
 We conclude that the Board's order is supported by substantial evidence on the record considered as a whole. In arriving at this conclusion we are not unmindful of the fact that there is some testimony in the record which tends to support the position of the Union. But the examiner's report shows that such of that testimony as was credited was considered but did not dictate a contrary conclusion in face of the body of opposing evidence. We perceive no basis for disturbing the Board's ultimate findings and conclusions on that score.
 
 
 19
 Accordingly, it is ordered that the Board's order be enforced and that a decree issue for that purpose.
 
 
 20
 Enforcement Ordered.
 
 
 
 Notes:
 
 
 [1]
 Milk Drivers' Union, Local No. 753, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America. Sometimes referred to herein as "Union" or "Local 753"
 
 
 [2]
 Section 8(e) of the National Labor Relations Act, as amended, (29 U.S.C.A. § 158(e)) which, in pertinent part, makes it an unfair labor practice for a labor organization and an employer:
 "* * * to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees * * * to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: * * *."
 
 
 [3]
 Korth Transportation Company, the intervenor herein, is such an independent Wisconsin hauler
 
 
 [4]
 The same form of agreement was utilized for execution by other employers in the milk industry, including distributors and master vendors who do not do their own processing of raw milk. The provisions concerning over-the-road hauling have no application to such distributors and master vendors
 
 
 [5]
 There is no evidence relating to actual application of the clause or of operation thereunder inasmuch as with the filing of the unfair labor practice charge on June 22, 1964, enforcement of the clause was by agreement postponed pending a Board decision, and the Regional Director did not further pursue an application for injunctive relief he had filed
 
 
 [6]
 Article 44 of the 1961 contract provided:
 "The transportation division shall not be reduced from its present status and immediate steps shall be taken to restore our members' jobs in all other plants covered by this agreement."
 Article 44 of the 1963 contract provided:
 "Transportation division shall not be reduced from its present status and immediate steps shall be taken to restore these jobs in all plants covered by this Agreement. Substantial progress shall be shown by August 15, 1963."
 
 
 [7]
 Before the Board, Haggerty and McNulty testified that the substitution was made so that the dairies would be permitted to use leased equipment. Haggerty stated: "That meant I think probably some of the dealers probably raised the question with regards to whether or not they had to purchase the equipment * * *"