**LONE STAR STEEL COMPANY,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent,**

**and**

**United Mine Workers of America,**
**Intervenor.**

**No. 77–1667.**

United States Court of Appeals,
Tenth Circuit.

Argued March 12, 1979.

Decided July 28, 1980.

Rehearing Denied Sept. 5, 1980.

Certiorari Denied Feb. 23, 1981.

See 101 S.Ct. 1349.

Lynn P. Mattson, Tulsa, Okl. (Kothe, Nichols & Wolfe, Inc., Tulsa, Okl., was on brief), for petitioner.

David A. Fleischer, Atty., N. L. R. B., Washington, D. C. (Jay E. Shanklin, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on brief), for respondent.

Maynard I. Ungerman, Tulsa, Okl. (John B. Wimbish, Tulsa, Okl., was on brief), for intervenor.

Before HOLLOWAY and BARRETT, Circuit Judges, and MILLER, Judge.*

HOLLOWAY, Circuit Judge.

Petitioner Lone Star Steel Company (Lone Star) seeks to set aside or modify a decision and order of the National Labor Relations Board (the Board), 231 NLRB No. 88, which modified an earlier ruling by an ALJ and dismissed petitioner's complaint against the United Mine Workers of America (the Union), charging a series of unfair labor practices under §§ 8(b)(3) and (b)(4)(A) of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(3) and (b)((4)(A) (1976). The Union has intervened against Lone Star's petition. General Counsel for the Board asks that the petition for review be denied.

---

* Honorable Jack Richard Miller, United States Court of Customs and Patent Appeals, Washington, D. C., sitting by designation.

1. Lone Star was not a member of the Bituminous Coal Operators' Association (herein "BCOA"), and it agreed to abide by the provisions of the contract only insofar as they applied to the Starlight mine as an independent coal operator. (R. 14, 653, 731–32, 931–32).

I

## THE FACTUAL BACKGROUND

a. *The controversy over the clauses.*

Lone Star is a Texas based manufacturer of steel products, principally pipe for use in the oil and gas industry. In connection with its business, Lone Star consumes 36,000 to 40,000 tons of coal per month to produce coke, an essential element in the steel making process. Coal is obtained both from outside suppliers and from coal fields in which Lone Star owns the mineral rights, the latter constituting a part of the Company's bituminous coal reserves which are maintained to assure a continuing supply of this vital raw material.

In January 1972 Lone Star acquired the Starlight mine near McCurtain, Oklahoma. The mine was initially operated by the River Corporation under a contract with Lone Star. The miners were covered by the terms of the 1971 National Bituminous Coal Wage Agreement (the national agreement) to which the River Corporation was a signatory. In April 1973 Lone Star began to mine the Starlight coal with its own employees and agreed to abide by the terms of the national agreement, with some exceptions not here relevant.[1] (R. 1158).

The national agreement was to expire by its own terms on November 12, 1974. By letter dated September 9, 1974, the Union informed Lone Star and all other independent signatories of its intention to terminate the 1971 wage agreement and requested that they execute a memorandum agreement expressing their intent to be bound by the terms of any successor national agreement negotiated by the Union and the BCOA.[2] Lone Star declined by a letter dated September 30 but offered to meet

---

2. By letter dated November 4, 1974, Union President Arnold Miller forwarded the Union's contract proposals and requested a reply no later than November 8. (R. 738). Lone Star received the letter on November 6, but did not respond to it. (R. 18–19).

and negotiate a new contract separately. When no agreement was reached by November 12 Lone Star employees at the Starlight mine joined others in a nationwide economic strike. (R. 1159; 19–20).

On December 5, 1974, the Union and the BCOA executed a new national agreement. The National Bituminous Wage Agreement of 1974 contained two provisions, herein called the "successorship" clause and the "application of contract" clause, which have given rise to the instant dispute. The successorship clause is a new provision set forth in Article I of the agreement:

> In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement. (R. 1160; 771).

The application of contract clause was carried over from the preceding national agreement and is set forth in Article II, section (f), of the new agreement:

> As part of the consideration for this Agreement, the Employers agree that this Agreement covers the operation of all the coal lands, coal producing and coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of

this Agreement) be put into production or use. (R. 1160; 709, 772).

Lone Star declined to accept the terms of the new national agreement and its Starlight mine employees remained on strike. On December 13, the first, in what was to become a series of meetings between the parties was held in an effort to reach an accord.[3] On January 3, 1975, another negotiating session was held during which the parties reached an interim agreement, subject to ratification, providing for the employees to return to work for a 60–day period in order to facilitate negotiations.[4] Ratification ensued and Lone Star's employees returned to work on January 6.

At the first meeting under the "truce" on January 20 the Union presented a draft of a letter expressing its interpretation that the application of contract clause would come into effect only if the Union first became the properly designated bargaining representative of the majority of employees at other locations.[5] Additional negotiating sessions were subsequently held, but the parties remained divided on several critical issues and the strike was resumed on March 8.[6]

On March 5 Lone Star filed unfair labor practice charges against the Union alleging that the successorship clause violated the "Hot Cargo" provision of §§ 8(e) and 8(b)(4)(A) of the Act, 29 U.S.C. § 158(e) and § 158(b)(4)(A) (1976). The charges were amended on March 14 and April 8 to include the most recent strike activities and the further refusal to bargain allegations based

---

**3.** At this meeting, Howard Jensen, petitioner's Vice-President, objected to a number of provisions in the national agreement, including provisions for a cost of living escalator and for payment of royalties on non-union coal, in addition to the successor and application of contract clauses.

In a letter dated December 19 Lone Star forwarded the Union a proposed substitute for the cost of living escalation clause. The Union advised Lone Star by mailgram dated December 30 that it was prepared to accept this substitute if Lone Star accepted the remainder of the national agreement.

**4.** Lone Star again emphasized at this meeting that it was not agreeable to the successor and application of contract clauses.

**5.** Jensen's response was that Lone Star still would not accept the clause, notwithstanding the Union's interpretation. The meeting ended in disagreement on the subject. (R. 35–36).

**6.** Lone Star had previously sought a 7–day extension of the truce period and the Union representatives apparently agreed to recommend such an extension to the local union. However, the majority of employees refused to continue to work without a contract.

It should be emphasized that on the two other occasions on which meetings were held during the truce period the parties remained in disagreement on the successorship and application of contract clauses.

on the Union's proposals.[7] One final bargaining session was held in Dallas in September 1975, but once again the parties failed to reach an agreement and the strike continued.[8]

b. *The Board's rulings*

The Board found that the successorship clause was not proscribed by the § 8(e) hot cargo provision of the Act and that the Union therefore did not violate § 8(b)(4)(A) by striking to compel Lone Star's acceptance of the clause. Specifically, the Board found that the operation of the Starlight mine was separate and distinct from Lone Star's other activities as a steel producer; that any successor would likely retain the same employees; and that the sale or transfer of the Starlight mine would merely substitute one entity for another while the business continued to operate without interruption, and therefore would not constitute "doing business" within the meaning of § 8(e). The Board further found that since the successorship clause would effectively assure the survival of the Starlight mine employees' previously negotiated wages and working conditions, it vitally affected the miners' terms and conditions of employment and was therefore a mandatory subject of bargaining. The Union was thus entitled to insist upon the clause to the point of impasse and did not run afoul of § 8(b)(3) of the Act by striking to obtain it.

The Board also found that the application of contract clause vitally affected the terms and conditions of employment of the bargaining unit employees at the Starlight mine because it protected the jobs and work standards of those employees by eliminating economic incentives which might otherwise encourage Lone Star to transfer work to other mines within its control. Since the clause was a mandatory subject of bargaining, the Union did not violate § 8(b)(3) of the Act by striking to compel its acceptance.[9]

Accordingly, the Board dismissed the complaint in its entirety.[10] We deal with

---

7. The Union had forwarded Lone Star its "complete proposal" in the form of a proposed addenda to the national agreement by letter dated March 3. That same day Union president Miller sent Lone Star a letter confirming the limitation on the application of contract clause. Lone Star rejected the proposals on March 5 by telegram. By telex dated March 10 the Union declared that it was "stand[ing] firm" on the rejected proposals but that it "[stood] ready to meet . . . and bargain at any mutually convenient time." Lone Star sent a telegram in response stating that in view of the strike, the status of negotiations, and the Union's avowed intent to stand firm, the parties had reached an impasse and it was withdrawing the proposals it had submitted to date. Lone Star did agree, however, to consider any new proposals made by the Union.

8. At this meeting the Union proposed to suspend operation of the successorship clause pending a determination of its legality by the Board or a reviewing court.

9. The ALJ had found that the clause would not operate to affect the terms and conditions of employment of the employees in the bargaining unit and was therefore not a mandatory subject of bargaining:

I simply do not see how applying this contract to another facility of the company, should it be created and should the Union be successful in gaining recognition rights, would have any bearing on the wages, hours and other terms and conditions of unit employees.

(R. 1128). Further, he concluded "that the principal purpose for the . . . clause is as an organizing device," and was therefore not a mandatory subject of bargaining. (R. 1128).

The Board disagreed, finding that application of an entire collective bargaining agreement to non-unit employees does not necessarily reveal a disguised intention to promote the Union's organizational interests, especially in view of the fact that it would operate only if the Union is recognized by an employer or certified by the Board as the collective bargaining representative of the non-unit employees. Moreover, the Board found that the fact that the Union might have sought a more carefully tailored provision addressed solely to the protection of unit employees, as suggested by the ALJ "does not render the subject matter of *this* clause any less vital to the employees' interests." (R. 1166). (Emphasis in original).

10. Member Walther, dissenting in part, was of the opinion that neither the successorship clause nor the application of contract clause was a mandatory subject of bargaining and that the Union had violated § 8(b)(3) of the Act by striking to compel Lone Star to accept the clauses. (R. 1168-75).

the reasoning underlying these rulings as we discuss the two controversial clauses, to which we now turn.

## II

### THE SUCCESSORSHIP CLAUSE

The ALJ found that the successorship clause was not within the prohibition of § 8(e),[11] relying on the Board's decision in *International Union of Operating Engineers, Local No. 701, AFL–CIO (Cascade Employers Association, Inc.)*, 221 NLRB 751, where a clause of substantially similar import was upheld. A majority of the Board in that case opined that notwithstanding the sale of the company's capital assets, the business enterprise survived and was the same employing industry.

A careful examination of the legislative history[12] convinced the majority that the sale or transfer of an entire business enterprise is not generally viewed as "doing business" within the meaning of § 8(e). Thus, unlike an agreement to refuse "to deal in 'hot goods,' 'unfair materials,' or 'blacklisted' products, or an agreement to withhold services from an 'unfair' employer, the primary concerns of Congress in legislating [Section 8(e)]," a change in ownership would still find the company engaging in its normal business and its relationship with customers and suppliers would not necessarily be affected. *Id.* at 753. Accordingly, the ALJ found that Lone Star was "doing business" in steel, not in selling coal properties, and that the Starlight mine would be the same employing entity in spite of a change in ownership.

The Board sustained the finding of the ALJ in this regard, relying on its more recent decision in *District No. 71, International Association of Machinists and Aerospace Workers, AFL–CIO (Harris Truck and Trailer Sales, Inc.)*, 224 NLRB 100 (1976),[13] where it had occasion to consider similar issues in the context of a sale of a portion of a business enterprise. The employer who operated as a franchised dealer for a number of major manufacturers of trucking equipment and trailers was a party to a collective bargaining agreement which contained a provision similar to the successorship clause in the instant case. Once again the Board rejected a literal interpretation of § 8(e) and held that the sale of two of the three retail facilities did not constitute "doing business" within the meaning of § 8(e).

The Board found that the instant case is similar to *Harris Truck*, that Lone Star's operations at the Starlight mine were separate and distinct from its activities as a steel producer, and that based on past experience the mine employees would in all likelihood continue in their jobs if the mine was sold. The Board concluded that the sale or transfer of coal properties would merely substitute one entity for another while the business continued without interruption and that such a transaction would not be within the Act's protection.

Lone Star argues that the Board erred because (1) the tests set out in the statute and cases demonstrate that § 8(e) covers the sale of assets; (2) even if § 8(e) does not normally cover asset sales, this case fits within the exception carved out by the Board and the Second Circuit in *National*

---

11. Section 8(e), 29 U.S.C. § 158(e) (1970), in relevant part provides:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person . . . . .

12. The legislative history reveals that § 8(e) was designed to protect neutral employers and

their employees from economic coercion designed to give a union victory in a labor dispute with another employer. More specifically, Congress sought to prevent a Union from using the collective bargaining agreement as a means to exert pressure on a neutral employer, thereby interrupting the actual or potential business relationship between the neutral employer and the employer deemed unfair by the Union. 221 NLRB at 752.

13. *Harris Truck* was decided after the ALJ issued his decision in this case.

*Maritime Union of America AFL–CIO; Commerce Tankers Corp.*, 196 NLRB 1100, *enf'd*, 486 F.2d 907 (2d Cir.), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559; and, (3) the successor language does not prohibit only asset sales and, when viewed with other provisions, prohibits leasing, subcontracting and other forms of "doing business" within the meaning of § 8(e). We find Lone Star's arguments unpersuasive.

### a. *Section 8(e)'s coverage*

■ Lone Star's argument that asset sales are within the coverage of § 8(e) begins with the observation that the statutory language provides two distinct and alternative tests for finding a violation—the first prohibiting an agreement by an employer to "cease or refrain from handling, using, selling . . . or otherwise dealing in any of the products of any other employer;" the second prohibiting an agreement by an employer to "cease doing business with any other person."

1. *The "products" test.* Lone Star contends that it is against precedent to hold that a capital asset cannot be the "product" of either a primary or secondary employer, and relies upon cases in which § 8(e) was held to prohibit an agreement by a primary employer to transfer its milk routes (a capital asset) only to union signatories.[14] Lone Star also urges us to read the "products" test from the viewpoint of the secondary employer, and argues that even if the coal operations are a capital asset to Lone Star, they would conceivably be a "product" to a company whose business was that of leasing and operating coal lands. Further, Lone Star says that the Board's decision here has improperly held that the sale of raw materials is not within the coverage of § 8(e).

We feel that the cases involving delivery routes are not controlling as the agreements found unlawful therein were directed to leasing or subcontracting, not the sale of delivery routes. Unlike the "one-shot" sale of capital assets contemplated by the instant clause, a lease or subcontract creates a continuing relationship, and if such agreements are restricted to concerns recognizing the Union, the signatory-producer becomes enmeshed in the Union's dispute with non-signatory distributors. *N.L.R.B. v. Joint Council of Teamsters, supra*, 338 F.2d at 29.[15] In *Meat and Highway Drivers Local v. N.L.R.B., supra*, the court observed that the use of subcontracting clauses as leverage to require secondary firms to become union signatories was the kind of pressure Congress intended § 8(e) to outlaw. 335 F.2d at 718. In contrast, when all or part of a business is sold, there may be no business relationship between the two employers either before or after the sale. Under such circumstances we feel there is no real danger of enmeshing the seller in a Union dispute with the purchaser.

We note that in one case dealing with milk deliveries the court found the "product" was the delivery services furnished by the secondary employers, not the milk routes transferred by the primary employer. *N.L.R.B. v. Joint Council of Teamsters, supra*, 338 F.2d at 25.[16] Thus, even applying the "products" test from the viewpoint of the secondary employer, it is the "product" produced, furnished, or offered by such employer that is relevant.

Finally, nothing in the Board's decision suggests that the sale of raw materials would be made exempt from the coverage of § 8(e). Lone Star uses coal mined on its lands as a raw material in the production of steel. The raw material is coal, not the lands from which it is mined. The successorship clause which is upheld does not restrict the company's right to buy or sell coal.

14. *See, N.L.R.B. v. Milk Drivers Local 753, IBT (Korth Transportation Co.)*, 392 F.2d 845 (7th Cir.); *N.L.R.B. v. Joint Council of Teamsters No. 38*, 141 NLRB 341, *enf'd*, 338 F.2d 23 (9th Cir.); *Meat and Highway Drivers, Local 710, IBT v. N.L.R.B.*, 335 F.2d 709 (D.C.Cir.).

15. The court noted that since the signatory-employer produced the majority of dairy products in the area, the agreement would have made it practically impossible for non-signatory distributors to resist union demands. 338 F.2d at 29.

16. The court also found the agreement unlawful under the "doing business" test. 338 F.2d at 26–27.

2. *The "cease doing business" test.* Lone Star argues that consideration of "products" is not required under the "cease doing business" test and that in ruling otherwise, the Board not only erred, but also overlooked the fact that the "cease doing business" language was added to § 8(e) for the very purpose of avoiding a possible limitation upon the subject matter of the agreements prohibited.

We are satisfied that the holding of the Board is consistent with Congressional intent. As originally offered by Senator Gore, § 8(e) made it an unfair labor practice for labor unions and common carriers to enter into agreements by which the latter agreed to "cease or refrain from handling or transporting any of the products of any other employer." II Leg. Hist. of the Labor Management Reporting and Disclosure Act of 1959, 1162–63 [hereinafter Leg. Hist.], discussed in *N.L.R.B. v. Joint Council of Teamsters, supra,* at 27. The legislative history demonstrates concern that common carriers were being forced by the Teamsters Union to accept contracts containing hot cargo provisions. I Leg. Hist. 475, 778–79, 838; II Leg. Hist. 1007, 1162–63. Senator McClellan proposed the addition of the "cease doing business" language, fearing that contracts containing that language would be used to circumvent the first prohibitory clause. *Id.* at 1162–63. Considering both clauses and the legislative history we find no indication that Congress was concerned with agreements by common carriers or employers in other industries relating to the sale of their business or of assets as was done here.

b. *The Commerce Tankers exception*

Lone Star argues that the instant case is like *Commerce Tankers, supra,* where the Board found violative of § 8(e) a provision in a collective bargaining agreement requiring that any purchaser of a vessel adopt the terms of the agreement. The employer owned and operated freight ships for use in the transportation of goods and commodities. In reaching the conclusion that buyers and sellers of ships in the maritime industry were "doing business" within the meaning of § 8(e), the Board relied on evidence that the sale of vessels was a common occurrence in the normal course of business.[17] The Board declined to rule on the question whether § 8(e) would apply to the sale of capital assets in other industries or in other circumstances. 196 NLRB at 1101.

Similarly in enforcing the Board's order in *Commerce Tankers* the Second Circuit accepted the Board's finding that buyers and sellers of ships were "doing business" in the maritime industry, but expressed doubt that the isolated sale of a capital item, such as a ship, fit within either the language of the statute or Congressional intent. The court expressly declined to pass on the question for the future. 486 F.2d at 907. The Board's opinion pointed out that the transaction did "not represent a novel situation," 196 NLRB at 1101, but rather was one of a series of similar transactions. Consequently, the contractual restriction posed a danger of disrupting what might otherwise have been an ongoing business relationship extending beyond the sale of a vessel.

By contrast, here it was not established that sales of coal properties are a common occurrence in the normal course of business in the steel industry or in that of Lone Star.[18] Rather, the evidence shows that the Company purchases coal lands and holds them on a long-term basis to insure an

---

17. The Board distinguished its decision in *Commerce Tankers* on this basis in *Cascade Employers* and *Harris Truck, supra,* 221 NLRB at 752–53; 224 NLRB at 103.

18. Lone Star argues that the record clearly demonstrates that the sale of coal lands was not uncommon. (Petitioner's Reply Brief at 20, n.7). It contends that the Union's chief negotiator testified that coal operations are bought and sold and that this was the primary reason for the Union's insistence on the clause. This testimony is characterized as evidence of "industry practice." *Id.* at 26, citing (R. 610).

We cannot agree. First, the company's contention that sales of such coal properties are not uncommon is not well supported by the record. Moreover, even if we treat the record as showing that occasional sales occur in such circumstances, this would be far short of the evidence relied on by the Board in *Commerce Tankers, supra,* 196 NLRB at 1100–01.

adequate supply of coal for use in its steel manufacturing process, not that it is in the coal business. (R. 1157; 73–74, 159–60). Moreover, if the Company did sell the mine the new owner would probably be in the business of mining coal, but not necessarily in the business of manufacturing steel. The successorship clause would not prevent the sale of coal to Lone Star. Both the company's business and operation of the mine would continue without interruption of any actual or potential business relationship; only the ownership of the mine would have changed.

The Third Circuit recently upheld an identical clause against an attack under § 8(e) by an employer engaged in the business of mining coal in *Amax Coal Co. v. N.L.R.B.*, 614 F.2d 872, 886 (3d Cir.), stating:

> [I]t is clear that the sale by Amax of all or part of its business operations would involve no continuing relationship with the purchaser. There is therefore no possibility of involving Amax in a labor dispute between the purchaser and its employees.

We agree that the sale of the Starlight mine would be more akin to the sale of a portion of a business entity, *see Harris Truck, supra,* than to the sale of a ship in *Commerce Tankers.*

c. *The scope of the successorship clause*

Lone Star further argues that the successorship clause on its face applies to subcontracting and leasing out, not merely to sales of "covered operations," so as to bring it within § 8(e).[19]

We cannot agree. The language refers to selling, conveying, or otherwise transferring or assigning; leasing and subcontracting are nowhere mentioned. Moreover, selling and conveying are permanent in character and under the rule of ejusdem generis "otherwise transferring or assigning" should be viewed as referring to other means of permanently transferring proper-

ty, rather than to leasing or subcontracting which are temporary in character.

■ It is true that the rule of construction is subject to the limitation that if it is possible to give reasonable effect to both the general and special provisions, both are to be retained. *Colorado Milling & Elevator Co. v. Chicago, R. I. & P. R. Co.*, 382 F.2d 834, 837 (10th Cir.). However, we feel that the successorship clause must be read in connection with other provisions in the contract which impose specific restrictions on the leasing, subleasing, and licensing out of coal lands, and the subcontracting of unit work. (R. 772). These specific restrictions, which do not require a lessee or subcontractor to assume the entire contract, would be mere surplusage if the successorship clause applied to a lessee or subcontractor.

■ We hold that the Board properly read the successorship clause as applying only to the kind of permanent disposition of assets that is outside the scope of § 8(e).

d. *The successorship clause as a mandatory subject of bargaining*

Section 8(b)(3) of the Act, 29 U.S.C. § 158(b)(3), makes it an unfair labor practice for a union "to refuse to bargain collectively with an employer . . . ." Of course, the duty to bargain extends only to mandatory subjects, "wages, hours, and other terms and conditions of employment." *NLRB v. Wooster Division of Borg-Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823; 29 U.S.C. § 158(d). Here the Board agreed with the ALJ that the successorship clause was a mandatory subject:

> [W]e are persuaded that a successor's assumption of any collective bargaining agreement negotiated between the Union and Lone Star would be vital to the protection of Starlight employees' previously negotiated wages and working conditions, as it is clear that the general rules governing successorship guarantee neither

---

**19.** The pertinent portion of the clause provides that the

"[e]mployer promises that its operations covered by this agreement shall not be sold, conveyed, or otherwise transferred or assigned. . . ."

employees' wages nor their jobs. In view of the foregoing, we agree that the Union's insistence upon including in any agreement reached a provision which would assure the survival of the fruits of collective bargaining, in the event Lone Star thereafter should dispose of the Starlight mine, is not violative of the Act, as an agreement in this regard would vitally affect the terms and conditions of employment of the miners who survive such a change in ownership. (R. 1164).

Lone Star argues that the Board (1) misconstrued the "vitally affects" test for mandatory subjects of bargaining, and (2) departed from both its own prior holdings and strong indications of the Supreme Court that the "decision" to sell a business is a managerial prerogative, not subject to § 8(d) of the Act. We cannot agree.

1. *The "vitally affects" test*: In *Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chemical Division*, 404 U.S. 157, 178, 92 S.Ct. 383, 397, 30 L.Ed.2d 341, the Court defined a subject for mandatory bargaining as including only those issues that settle an aspect of the employer-employee relationship. Although matters involving individuals outside the employment relationship do not normally fall within that definition, they are not entirely excluded. The test is "not whether the third-party concern is antagonistic to or compatible with the interests of bargaining-unit employees, but whether it *vitally affects* the 'terms and conditions' of their employment." 404 U.S. at 179, 92 S.Ct. at 397–98. (Emphasis added). The Board applied this test in concluding that the successorship clause was a subject for mandatory bargaining.

Lone Star argues that the Board's application of the "vitally affects" test was erroneous because it failed to consider the effect on Lone Star's freedom to conduct its business.[20] This factor was discussed by the Court in *NLRB v. Burns International Se-*

curity Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61, and Lone Star contends that the successorship clause would do what the Court sought to avoid there—saddle a potential purchaser with Lone Star's contract—thereby inhibiting Lone Star's freedom to dispose of capital assets. Lone Star relies on *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board, Hotel and Restaurant Employees and Bartenders International Union, AFL–CIO*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46, saying that there the Court declined to order a purchaser to be bound by the substantive terms of its predecessor's collective bargaining agreement. In sum, Lone Star urges us to hold that (1) any restraint on the free transfer of capital must be taken into account, and (2) because the Court was unwilling to allow the imposition of such restraints in the "successor" cases, that rationale precludes the Board doing so here where the focus is on a predecessor.

■ The classification of bargaining subjects as "terms or conditions of employment" is a matter of special Board expertise. *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 685–86, 85 S.Ct. 1596, 1599–1600, 14 L.Ed.2d 640. Its judgment as to what is a mandatory bargaining subject is entitled to considerable deference. *Ford Motor Co. (Chicago Stamping Plant) v. NLRB*, 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420. We cannot say that in applying the "vitally affects" test here so as to assure survival of the previously negotiated wages and working conditions of the Starlight mine employees the Board "neglected to give the adverb its ordinary meaning." *Pittsburgh Plate Glass, supra*, 404 U.S. at 182, 92 S.Ct. at 399. At the ALJ's hearing, Mr. Bank, a Union representative throughout the negotiations, described the consequences of a sale by Lone Star without the successorship clause (R. 607):

> [F]rom the point of view of the men at the mine it would be a tragedy, especially

---

**20.** *Pittsburgh Plate Glass* makes clear that application of the test does not "[turn] only on the impact of the third-party matter on employee interests. Other considerations, such as the effect on the employer's freedom to conduct his business, may be equally important." 404 U.S. at 179, n.19, 92 S.Ct. at 398, n.19.

in this case where they had to stay out to get an agreement. They'd have an agreement signed and then they'd have Lone Star to go out and sell to somebody. He wouldn't honor the UMWA agreement and they'd have to start all over again.

Moreover in *Pittsburgh Plate Glass* the Court merely stated that "the effect on the employer's freedom *may* be equally important." 404 U.S. at 179, n.19, 92 S.Ct. at 398, n.19. (Emphasis added). To accept Lone Star's contention would mean that an employer's freedom to rearrange his business would not be balanced here by some protection to the employees from a sudden change in the employment relationship. *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898. We are satisfied that the Board struck a proper balance here in applying the "vitally affects" test.

Lone Star relies heavily on *NLRB v. Burns International Security*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61.[21] *Burns* held that the law imposes no obligation on a successor-employer to honor the substantive terms of a collective bargaining agreement negotiated by its predecessor where the successor has not agreed to do so.[22] The Court recognized that compelling an employer to assume its predecessor's collective bargaining agreement might inhibit the transfer of capital. Nevertheless, safeguarding the free flow of capital was not the Court's primary concern in *Burns*. The main concern seems to have been with the funda-

mental policy of freedom to negotiate embodied in § 8(d) of the Act, which precludes the Board from compelling a party to agree to a contractual provision against its will. 406 U.S. at 282–84, 92 S.Ct. at 1579–1580. Indeed, the Court emphasized in *Burns* that the company had not manifested its intent to assume the obligations of the contract and found that "allowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *Id.* at 287, 92 S.Ct. at 1582, *quoting H. K. Porter Co. v. NLRB*, 397 U.S. 99, at 108, 90 S.Ct. 821, at 826, 25 L.Ed.2d 146.

We cannot agree that the restraint on the free transfer of capital assets is the same when affected by agreement as when imposed by a Board order. In holding that a successor employer was not bound by operation of law to assume its predecessor's obligations, the Court observed in *Burns* that a successor might be bound by other means (406 U.S. at 291, 92 S.Ct. at 1584):

> In many cases, of course, successor employers will find it advantageous to observe the pre-existing contract, rather than to face uncertainty and turmoil. Also, in a variety of circumstances involving a merger, stock acquisition, reorganization, or *assets purchase*, the Board might properly find as a matter of fact that the successor had assumed the obli-

---

**21.** Lone Star's contention that the Board failed to consider the effect on its freedom to conduct its business is apparently based on the treatment which the Board accorded *NLRB v. Burns International Security, supra*, in its decision (R. 1164 n.13):

> That case is inapposite here . . . inasmuch as it dealt with the question of whether a successor's freedom was restricted by operation of law (*i. e.*, whether a successor was automatically bound to the terms of a pre-existing agreement), whereas the issue herein is whether voluntary restrictions upon the freedom of the predecessor (the seller) may be insisted upon by a union.

Lone Star argues that this distinction is merely an effort to sidestep *Burns*. (Petition-

er's Brief at 34, Reply Brief at 18.) A more reasonable interpretation of the Board's decision is that it *did* consider that the successorship clause might impose the kind of restraint on Lone Star's freedom to conduct its business that was rejected in *Burns*, but struck the balance here in favor of protecting the interests of the employees. As the following discussion will demonstrate, we also feel that Lone Star's reliance on *Burns* is misplaced.

**22.** *Burns* was held, however, to have a duty to bargain with the incumbent union arising from its voluntary takeover of a recently certified bargaining unit which remained largely unchanged. 406 U.S. at 277–81, 287, 92 S.Ct. at 1576–1579, 1582.

gations under the old contract. (Emphasis added).

Lone Star's reliance on *Howard Johnson Co. Inc. v. Detroit Local Joint Executive Board et al.,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46, is also misplaced. The case merely held that since *Burns* established that a purchaser of a business was not obligated by law to hire any of its predecessor's employees, the Union was precluded from circumventing that holding by bringing suit under § 301 to compel arbitration, rather than instituting an unfair labor practice proceeding. 417 U.S. at 262, 94 S.Ct. at 2243. As in *Burns,* the Court was not ruling on a case where there was an agreement that a successor would be bound by the previous bargaining contract.

■ Thus we conclude that the Board did not err in its application of the "vitally affects" test.

2. *"Decision" v. "Effects" Bargaining*: Lone Star argues that the Board departed from its ruling in *General Motors Corp., GMC Truck & Coach Division,* 191 NLRB 951, *petition for review denied,* 470 F.2d 422 (D.C. Cir.), where the Board held that a General Motors decision to sell a retail facility was not a mandatory subject, although the company was obligated to bargain over the effects of the decision on unit employees. Lone Star also relies on language in *Fibreboard Paper Products Corp. v. N.L.R.B.,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, to the effect that the decision to sell all or part of a business is a prerogative of management, not subject to § 8(d) of the Act. Lone Star insists that the successor language "inhibits the decision making process . . . ," (Petitioner's Brief at

36), and therefore cannot be viewed as an "effect."

We cannot agree. First, we feel that *General Motors Corp.,* is inapposite since there, on learning of the company's impending sale of one of its retail truck outlets, the Union insisted on bargaining *prior* to any change in ownership. The court upheld the Board's determination that the company's decision to sell was not subject to mandatory bargaining. The business decision was involved. 470 F.2d at 425. Here the successorship clause implicates the effect of the decision, rather than the decision itself. Under the proposed contract Lone Star would still be free to dispose of its coal properties as it desired, without first bargaining with the Union. On the other hand the effect would be that the employees are assured that the fruits of collective bargaining would survive a change in ownership.

We are not persuaded that the Board erred in its ruling that the successorship clause was a mandatory subject, fairly balancing the rights of the employer and the employees. *See Morrison Cafeteria's Consolidated, Inc. v. N.L.R.B.,* 431 F.2d 254, 257–58 (8th Cir.). Concluding that the clause was not unlawful and was a mandatory subject, we will sustain the part of the Board's order concerning the successorship clause and dismissing petitioner's complaint with respect thereto.

### III

### THE APPLICATION OF CONTRACT CLAUSE

As stated, the application of contract clause, as modified by the Union interpretation,[23] would require automatic application

---

**23.** As related earlier, see p. 548 and note 5, *supra,* the interpretation was introduced by a Union letter on January 20, 1975, in order to clarify the Union's interpretation that the clause would come into effect only if the Union first became recognized or certified as the bargaining representative of the majority of the employees at other locations. The ALJ stated that "[t]he Union recognizes that as written, the application of contract clause could lead to an unlawful implementation." (R. 1123). However, he went on to state that the clause,

"as modified by the Union, sufficiently protects the Section 7 rights of the prospective new employees. It is not alleged to be unlawful, and I conclude it is not." (R. 1127). The Board ruled on the clause as interpreted by the Union. (R. 1166). However, as stated in note 5, *supra,* Lone Star refused to accept the clause, despite the Union interpretation.

There is a dispute between the parties over whether the legality of the original clause is properly before us for review. However, since the clause, even with the interpretation, is held

of the national agreement to any of the Company's coal-producing facilities presently owned or hereafter acquired, including those of subsidiaries and affiliates, upon recognition or certification of the Union as the employees' bargaining representative.

In reaching his conclusion that the clause was a non-mandatory subject, the ALJ found that the scope of the clause was overly broad and that its objectives could have been accomplished by less drastic means:

> Unit standards could be protected simply by a clause requiring Lone Star, should it open a new mine, to pay employees no less than the wages set forth in the contract. It could do so without the contract automatically and in every respect applying to the new operation as the proposed clause does. Further, the clause could operate in areas not necessarily competitive with the work unit employees are doing, e. g., coal preparation facilities as opposed to mining; and to that extent it goes beyond protecting unit work and standards.

> \*       \*       \*       \*       \*       \*

> A fair interpretation of this clause, along with Bank's testimony, is that a principal purpose for the application of contract to coal lands is to facilitate organizing.

(R. 1126).[24] Accordingly, the ALJ concluded that the clause did not "vitally affect" the unit employees and was not a mandatory subject (R. 1128):

> . . . [T]o agree in advance concerning the terms and conditions of employment of nonexistent employees in a new and nonrelated facility does not particularly relate to wages, hours or the

terms and conditions of employment of unit employees. I simply do not see how applying this contract to another facility of the company, should it be created and should the Union be successful in gaining recognition rights, would have any bearing on the wages, hours and other terms and conditions of unit employees.

The Board disagreed, finding that (1) the clause would protect jobs and work standards of unit employees by removing economic incentives to transfer unit work; (2) the fact that the Union could have sought more specific provisions "[did] not render the subject matter of *this* clause any less vital to the employees' interests;" (3) application of the entire collective bargaining agreement to non-unit employees, including its non-economic provisions, did not represent a disguised purpose to further the Union's institutional or organizational interests because the clause would become operative only if the Union is recognized or certified as the representative of other units. Having concluded that the clause was a mandatory subject, the Board ruled that the Union did not violate § 8(b)(3) of the Act by striking to obtain it. (R. 1165–66) (emphasis in original).

Lone Star argues that the Board has misapplied the "vitally affects" test. The gist of the argument is that *Allied Chemical Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341, and *Teamsters Union v. Oliver,* 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312, carved out a limited exception which allows a subject dealing with matters outside the unit to be considered mandatory only where it would vitally affect job security, and only where the extra-unit language constitutes a direct attack on the perceived problem. Lone Star

---

to be a non-mandatory subject for reasons that follow, we need not resolve the procedural dispute.

24. Mr. Banks testified as follows (R. 629):
Q: Did you state whether the purpose of Article Two, Section (f) is an organizing tool?
A: No. There was discussion at the table about the fact that it was obviously attractive in the terms of organizing, but he was told quite clearly, yes. Now, subsequently a major concern with the section was to

insure as far as the UMWA possibly could that no mines would be developed that were under our jurisdiction which would have terms and working conditions that were significantly less than what were existing at the Starlight, so that we could be assured that the people at the Starlight mine would not be put out of work because of poor development of this [sic] subsequently developed facilities.

558

maintains that the instant clause is not within the exception and that the Board erred in rejecting the ALJ's findings that the test was not satisfied. On this clause, we are persuaded to agree with Lone Star.

In *Pittsburgh Plate Glass* the Supreme Court referred to its earlier decision in *Teamsters Union v. Oliver*, as an example of the kind of third-party concerns that vitally affect the terms and conditions of employment of bargaining unit employees. 404 U.S. at 178–79, 92 S.Ct. at 397–398. *Oliver* held that a mandatory subject of bargaining was involved where an agreement required a carrier to pay a truck owner, who leased his vehicle to the carrier and then drove his truck in the carrier's service while receiving wages of drivers of carrier-owned vehicles, a rental sufficient to cover the owner's cost of operating the truck. Without determining whether the owner-drivers were employees or independent contractors, *see United States v. Drum*, 368 U.S. 370, 382–83 n. 26, 82 S.Ct. 408, 414–415 n. 26, 7 L.Ed.2d 360, the Court found that the provision for a minimum rental was "a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective bargaining contract." 358 U.S. at 294, 79 S.Ct. at 304. The provision was of vital concern to the carrier's own drivers because an inadequate rental might have encouraged a carrier to withdraw its vehicles from service, thus placing the employees' jobs in jeopardy. *Id.*

■ The General Counsel and the Union contend here that the application of contract clause protects the jobs and working conditions of unit employees from a danger similar to that in *Oliver*. They argue that the clause removes the Company's economic incentive to transfer work to another mine

where the terms and conditions of employment might be inferior.[25] We cannot agree.

The provision for the minimum rental in *Oliver* was carefully drafted to remedy a specific problem over which the parties had disagreed for seventeen years. 358 U.S. at 291–292, 79 S.Ct. at 301–303. By contrast, the instant clause is not so directed. It is hard to read this language as a "direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective-bargaining contract." *Id.* at 294, 79 S.Ct. at 304. This application of contract clause reaches all new operations and is much broader than necessary to accomplish the legitimate Union goal of protecting employees against a shift of production to another mine to evade standards and wages at the Starlight mine. The clause even requires that the agreement be put into effect *in toto* elsewhere, including the non-economic provisions having no bearing on the unit employees. *Amax Coal Co. v. N.L.R.B.*, 614 F.2d 872, 884 (3rd Cir.).

■ We are mindful that we must accord considerable deference to the Board's judgment as to what is a mandatory subject. *Ford Motor Co. v. N.L.R.B., supra*, 441 U.S. at 495, 99 S.Ct. at 1848. However we are convinced that here the Board did not properly observe the two-prong requirement of *Oliver* that in order for a subject involving employees outside the unit to be considered mandatory it must vitally affect the terms and conditions of employment or the job security of unit employees and must represent a direct frontal attack on the problem threatening such interests. *See Oliver, supra*, 358 U.S. at 294, 79 S.Ct. at 303; *Pittsburgh Plate Glass, supra*, 404 U.S. at 178–79 and n. 18, 182, 92 S.Ct. at 397–398 and n. 18, 399. Here the implementation of

25. To support their argument, the Union and the Board's General Counsel cite testimony of the Union's chief negotiator at the hearing before the ALJ, including the following:

We explained to Mr. Jensen this [the clause] was important because without the provision in the contract the company would be free to develop another mine and have it go UMWA, negotiate the terms and conditions of Employers [sic] which would be substandard in the sense that they would cost the company less and then develop that company very possibly to the detriment of the people in the unit at Starlight taking away their jobs. This has also happened before. That is why we were interested in that provision.
(R. 610).

the clause could only affect unit jobs if the company opened another mine. The Board ignored the ALJ's finding that application of the contract to other phases of coal production would have no bearing on unit jobs. And as noted the automatic application of the entire collective bargaining agreement, including its non-economic provisions, to other appropriate units employed at other facilities operated by the company does not represent the kind of direct frontal attack on the problem demanded by *Oliver.*

In sum, we conclude that the Board erred in holding that the application of contract clause was a mandatory subject of bargaining. Accordingly we hold that by striking to achieve agreement on a nonmandatory subject the Union refused to bargain within the meaning of § 8(b)(3) of the Act.[26]

The order of the Board dismissing the complaint is sustained in part and set aside in part and the case is remanded for further proceedings, all in accordance with this opinion.

BARRETT, Circuit Judge, concurring in part and dissenting in part:

I fully concur with the majority's holding that the Board erred in ruling that the application of contract clause was a mandatory subject of bargaining.

I respectfully dissent from the majority's view that the Board did not err in finding that the language in the successorship clause of the contract is a mandatory subject of collective bargaining. I agree with the views expressed by dissenting member Walther and the finding/conclusion of the ALJ. In my view the successorship clause was not within the prohibition of § 8(e).

---

26. The ALJ found that the clause is lawful and that if the parties had voluntarily agreed on its inclusion, it would have been enforceable. We express no opinion on this finding. We merely hold that it is not a mandatory subject of bargaining.