644 F.2d 930
 106 L.R.R.M. (BNA) 2649, 90 Lab.Cas. P 12,611,
1980-81 Trade Cases 63,852,
8 Fed. R. Evid. Serv. 68
 BERMAN ENTERPRISES INC., Standard Tank Cleaning Corp., and
General Marine Transport Corp., Plaintiffs-Appellants,
v.
LOCAL 333, UNITED MARINE DIVISION, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, Marine Towing and Transportation
Employers' Association, McAllister Brothers, Inc., Diesel
Vessel Operators, Inc., Spentonbush Transport Service, Inc.,
Morania Oil Tanker Corporation, Bouchard Transportation
Company, Inc., Moran Towing & Transportation Company, Inc.,
Poling Transportation Corporation, Eklof Marine Corporation,
Red Star Marine Services, Inc., Reinauer Transportation
Companies, Inc., and Turecamo Coastal & Harbor Towing
Corporation, Defendants-Appellees.
 No. 112, Docket 80-7260.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 3, 1980.
Decided Feb. 25, 1981.
 
 Jared Stamell, New York City (Kevin J. McGill, Clifton, Budd, Burke & DeMaria, New York City, on brief), for plaintiffs-appellants.
 Daniel A. Pollack, New York City (Martin I. Kaminsky, Pollack & Kaminsky, New York City, on brief), for defendant-appellee Marine Towing and Transp. Employers' Ass'n.
 Seymour M. Waldman, Waldman & Waldman, New York City, for defendant-appellee Local 333, United Marine Division, Intern. Longshoremen's Ass'n.
 Michael J. McAllister, Lunney & Crocco, New York City, of counsel, for defendant-appellee McAllister Brothers, Inc.
 Martin J. McHugh, McHugh, Leonard & O'Conor, New York City, of counsel, for defendants-appellees Diesel Vessel Operators, Inc., Spentonbush Transport Service, Inc., and Red Star Marine Services, Inc.
 Jacob I. Goodstein, Benjamin Wm. Mehlman, Goodstein, Mehlman & Krones, New York City, of counsel, for defendant-appellee Morania Oil Tanker Corp.
 Celestino Tesoriero, Grainger & Tesoriero, New York City, of counsel, for defendant-appellee Bouchard Transp. Co., Inc.
 Norman Yoerg, Jr., White & Case, New York City, of counsel, for defendant-appellee Moran Towing & Transp. Co., Inc.
 Herbert B. Halberg, Beck, Halberg & Williamson, New York City, of counsel, for defendant-appellee Eklof Marine Corp.
 Kenneth J. McGuire, Stein, Bliablias & McGuire, Newark, N. J., of counsel, for defendant-appellee Reinauer Transp. Companies, Inc.
 Renato C. Giallorenzi, Giallorenzi & Campbell, New York City, of counsel, for defendant-appellee Turecamo Coastal & Harbor Towing Corp.
 Before OAKES and MESKILL, Circuit Judges, and WERKER, District Judge.*
 OAKES, Circuit Judge:
 
 
 1
 This appeal concerns labor practices and collective bargaining provisions in the marine transportation service industry. Appellants are three affiliated companies, Berman Enterprises Inc. (Berman), General Marine Transport Corp. (General Marine), and Standard Tank Cleaning Corp. (Standard Tank). They allege antitrust violations by Marine Towing and Transportation Employers' Association (Association), a multiemployer bargaining organization, certain of the Association's members, and Local 333, United Marine Division, International Longshoremen's Association (Union), a union representing vessel employees. Appellants also allege labor law violations by the Union. The United States District Court for the Southern District of New York, Robert W. Sweet, Judge, at the conclusion of the evidence dismissed all elements of the antitrust claim except that portion alleging conspiracy to refuse to deal with Berman. Thereafter the jury returned verdicts against Berman and the companies affiliated with it on the remaining antitrust claim and on the labor claim. The court then denied the appellants' request for injunctive relief. On appeal the three affiliated companies argue that the antitrust claim should not have been dismissed, that the court should have directed a verdict for the appellants on the labor claim, and that evidence concerning salaries of Berman's officers should neither have been admitted nor have been the subject of an argument about Berman's damages. We cannot accept these contentions and, accordingly, affirm the judgment below.
 
 I. FACTS
 
 2
 Berman, General Marine, and Standard Tank are all owned by Standard Marine Services, Inc., which in turn is owned by Evelyn Berman Frank and her brothers, Berman operates tugs, barges, and harbor tankers in New York harbor; General Marine operates two ships which dispose of sewage sludge produced by municipal customers; and Standard Tank operates a vessel-cleaning facility and one tank-cleaning vessel.
 
 
 3
 General Marine was a member of the Association at the time the dispute in question arose, but Berman and Standard Tank were not and the Union did not represent their employees.[1] The Union and the Association have three labor contracts covering employees on tugs, barges, and self-propelled tankers, respectively. Berman, or its predecessor, and the appellee Association member corporations have for many years been customers as well as competitors of one another, hiring each other's tugs or barges from time to time, but also competing for business from third parties. Berman operates with one man on a barge and four-man barge crews, whereas members of the Association, pursuant to a collective bargaining agreement with the Union, operate with two men on a barge and a six- or seven-man barge crew.
 
 
 4
 Well before April 1, 1976, the date of the new collective bargaining agreement with which we are concerned here, the Union unsuccessfully sought to require Berman to cease towing unmanned vegetable oil barges[2] of MOTC Acquisitions Corp. (MOTC). The Union had decided that all barges with less than a certain carrying capacity should be manned by a crew of two. A federal district court, however, enjoined the Union from so coercing Berman, and the National Labor Relations Board subsequently found that the Union had engaged in a secondary boycott unlawful under section 8(b)(4) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(4), as well as having violated other provisions of the NLRA, United Marine Division Local 333, 226 N.L.R.B. 1214 (1976). Shortly thereafter the Union, claiming that it had previously terminated its labor contract, struck General Marine but again was unsuccessful; a federal district court enjoined the strike and this court upheld the injunction on appeal, General Marine Transport Corp. v. Local 333, United Marine Division, No. 75-7559 (2d Cir. Mar. 10, 1976). General Marine later obtained favorable holdings on this matter both before the Board, which found violations of sections 8(d), 8(b)(3), and 8(b)(1)(A) of the NLRA, United Marine Division Local 333, 228 N.L.R.B. 1107 (1977), and before an arbitrator.
 
 
 5
 In January 1976 the Union made certain demands upon the Association for contract provisions to be incorporated in the new collective bargaining agreement, which was to commence on April 1, 1976. This was followed by a Union demand made to General Marine that all the Berman companies' crew members, except those on the tank-cleaning vessel, join the Union and that all hiring be done through the Union hiring hall. Further negotiations, accompanied by the litigation noted above, resulted in an impasse, with General Marine refusing to resign from the Association despite the Association bargaining committee's statement that unless General Marine resigned, the Association would enter into a contract that satisfied the Union. Finally on March 26, 1976, the Union and the Association entered into a Memorandum of Agreement containing what we will call the "vegetable oil" and the "affiliates" clauses, the first in effect requiring two men on vegetable oil barges carrying less than 55,000 barrels[3] and the second requiring affiliates of Association members to operate under the contract.[4]
 
 
 6
 After the Union ratified the new contract, the Union president wrote General Marine to demand compliance with the affiliates clause and to list fourteen Berman-General Marine vessels which he claimed were covered by the Union-Association contract. At about the same time, in early April 1976, the Union membership was informed about and advised to enforce the vegetable oil clause, on pain of discipline. Following General Marine's response that the contract exceeded the scope of the Association's bargaining power and constituted a group boycott, the Union again struck General Marine. The Union also advised Association members not to deal with Berman and specifically not to tow Berman barges with less than two men aboard.[5] Subsequently, in June 1976, Berman filed a petition with the Board for an election to determine whether its employees wanted to be represented by a labor union. The Union opposed such an election, but the Board's Regional Director ordered an election and the Berman employees chose Marine Engineers Beneficial Association (MEBA) as their union.
 
 
 7
 This suit by Berman, General Marine, and Standard Tank is in two counts the first charges all defendants with a combination in restraint of trade under section 1 of the Sherman Act, 15 U.S.C. § 1, and seeks damages under section 4 of the Clayton Act, 15 U.S.C. § 15, and an injunction under section 16 of the Clayton Act, 15 U.S.C. § 26. The second count charges the Union alone with participation in a secondary boycott in violation of section 303 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 187, and seeks damages from the Union.
 
 
 8
 The court below held that the vegetable oil and the affiliates clauses, as well as the actions taken under them, were not themselves antitrust violations in light of the so-called "labor exemption" to the antitrust laws,[6] and, alternatively, that these clauses did not have the anticompetitive purpose or effect necessary to violate section 1 of the Sherman Act, though they could be used as evidence of an agreement to refuse to deal, an agreement which the jury specially found did not exist. The jury also specially found against Berman and its affiliated companies on three questions submitted under the labor law count.[7]
 
 II. DISCUSSION
 A. Antitrust Claim
 
 9
 Berman argues that the vegetable oil and the affiliates clauses had the purpose of restraining Berman from charging lower prices and from taking work away from Union members, and that the clauses had the effect of excluding Berman as a competitor of Association members and restricting the conditions under which Berman could hire an Association tug.
 
 
 10
 Berman begins with the assertion that the nonstatutory labor exemption is not available to protect a combination, between a union and a nonlabor group, that has an anticompetitive purpose or effect on the business of another, Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 809-10, 65 S.Ct. 1533, 1539, 1540, 89 L.Ed. 1939 (1945), particularly in light of the narrow construction to be given exemptions from the antitrust laws, Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979). This argument has two prongs. The first is that the agreement here imposed wages, hours, and working conditions on nonparty employers and, accordingly, was not exempt from the antitrust laws. Federal Maritime Commission v. Pacific Maritime Association, 435 U.S. 40, 98 S.Ct. 927, 55 L.Ed.2d 96 (1978) (upheld Federal Maritime Commission finding that multiemployer bargaining unit-union contract requiring nonparties to comply with fringe benefit programs and other work rules for hiring-hall work force members is not protected by the nonstatutory exemption and is subject to section 15 of the Shipping Act, 46 U.S.C. § 814, which regulates anticompetitive agreements in certain maritime industries); United Mine Workers v. Pennington, 381 U.S. 657, 665-66, 85 S.Ct. 1585, 1590-1591, 14 L.Ed.2d 626 (1965) (union forfeits its exemption from antitrust laws when it agrees with one set of employers to impose a wage scale on other bargaining units). The second prong relies on the analysis in Local 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 689-90, 85 S.Ct. 1596, 1601-1602, 14 L.Ed.2d 640 (1965),[8] and Connell Construction Co. v. Plumbers Local 100, 421 U.S. 616, 622-23, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975), which concludes that agreements reached on nonmandatory subjects of bargaining matters other than wages, hours, and working conditions are not within the nonstatutory exemption if they constitute restrains on competition in a business market. See also Commerce Tankers Corp. v. National Maritime Union, 553 F.2d 793, 801 (2d Cir.) (Jewel Tea-Connell analysis followed), cert. denied, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977). Thus Berman's point is that the challenged agreement fell outside the scope of the nonstatutory labor exemption to the antitrust laws: it failed the Pennington test because it set employment terms for nonparty employers and it failed under the Jewel Tea-Connell analysis because it embraced nonmandatory subjects of collective bargaining. We disagree.
 
 
 11
 Both of the disputed clauses represented legitimate union objectives because they dealt either with working conditions, Jewel Tea,[9] or job preservation, Intercontinental Container Transport Corp. v. New York Shipping Association, 426 F.2d 884, 886-88 (2d Cir. 1970) (contract held exempt from the antitrust laws under the labor exemption because the union had a right to preserve the jobs of its members). Any indirect effect upon Berman was permissible, especially because the contract did not forbid the use of nonunion members. See California Dump Truck Owners Association v. Associated General Contractors, 562 F.2d 607, 613-14 (9th Cir. 1977) (clause valid even though it might have some effect on the hiring of nonunion members, because it did not preclude the hiring of these members). The vegetable oil clause did not impose any requirements on any nonparty to the collective bargaining agreement. Rather, it was directed at union employers (as discussed further in section II. B. of this opinion) and was designed to prevent erosion of manning standards by outside economic pressure, to protect jobs, and to promote safety at sea.[10]
 
 
 12
 The affiliates clause is more troublesome. There is case law holding that broad clauses such as this one deal with nonmandatory subjects, at least when they go beyond the language "necessary to accomplish the legitimate Union goal of protecting employees against a shift of production to another (place) to evade standards and wages at the (present place of employment)." Lone Star Steel Co. v. NLRB, 639 F.2d 545 at 588 (10th Cir. 1980) (clause applying contract to all facilities presently owned or hereafter acquired by the employer and facilities owned by subsidiaries and affiliates, upon recognition of the union, whether or not such operations compete with the work of unit employees, was not a mandatory subject), cert. filed, 49 U.S.L.W. 3456 (U.S. Dec. 10, 1980) (No. 80-940); see also Amax Coal Co. v. NLRB, 614 F.2d 872, 883-84 (3d Cir. 1980) (clause applying contract to employees who work in other than the certified unit and who select the union held not to be a mandatory subject), cert. filed, 49 U.S.L.W. 3353 (U.S. Oct. 27, 1980) (No. 80-692). Appellees would distinguish Lone Star Steel and Amax Coal from the instant case on the basis that the former are bargaining cases under section 8(b)(3) of the LMRA. But the Jewel Tea-Connell analysis relates us back to the issue of mandatory versus nonmandatory subjects of bargaining and, thus, these cases are relevant.
 
 
 13
 Although the language in the affiliates clause here may appear broader than necessary to fulfill legitimate union objectives, as applied to Berman the clause served legitimate goals of the Union. The reason for this is that General Marine and Berman treated employees as fungible, that is to say, the two affiliated companies used employees interchangeably.[11] There was also some transferring back and forth of vessels between General Marine and Berman. Berman was not an independent, unrelated employer. Under these circumstances, there was in reality but a single employer, with interrelated operations, common management, and centralized control of labor relations, see South Prairie Construction Co. v. Local 627, Operating Engineers, 425 U.S. 800, 802 n. 3, 96 S.Ct. 1842, 1843 n. 3, 48 L.Ed.2d 382 (1976) (quoting Radio Union v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965)), and the affiliates clause vitally affected working conditions and wages of the Union members. At least for purposes of application of the antitrust exemption, it was a legitimate union objective to protect employees against shifts of work days (and vessels) designed to avoid the standards and wages established in the collective bargaining agreement. Furthermore, cases such as Federal Maritime Commission and Pennington are not applicable here because they involved employer bargaining groups and unions conspiring to injure truly separate concerns. Berman's underlying factual premise that it was an unconnected nonparty is simply not true.
 
 
 14
 We also agree with the court below, in the alternative, that even if the vegetable oil and the affiliates clauses do not fall within the labor exemption, there was no proof of an antitrust violation under the rule of reason, which would be applicable here. See, e. g., National Society of Professional Engineers v. United States, 435 U.S. 679, 687-88, 98 S.Ct. 1355, 1363-1364 (1978); Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 50 & n. 16, 58-59, 97 S.Ct. 2549, 2557 & n. 16, 2561-2562, 53 L.Ed.2d 568 (1977). Despite the Union newspaper column's language quoted in the margin,[12] we fail to discern either an anticompetitive purpose or an anticompetitive effect. The Supreme Court, in National Society of Professional Engineers, 435 U.S. at 687-88, 98 S.Ct. at 1363-1364, made it clear that the inquiry under the rule of reason is directed at the challenged restraint's overall impact on competitive conditions, rather than whether a particular party has been restrained by the conduct at issue. In the instant case, neither the vegetable oil nor the affiliates clause constituted an unreasonable restraint of trade. There was a good deal of testimony to establish that the true purposes behind the clauses were job preservation, maintenance of working conditions, and safety, none of which is anticompetitive in nature. As for the effect of the clauses, they were in effect for only a short period of time, and to the extent that Berman suffered any drop in the volume of its business, the evidence clearly demonstrated that it was due to conditions unrelated to this dispute. See generally D. Leslie, Principles of Labor Antitrust, 66 U.Va.L.Rev. 1183 (1980) (suggesting that an antitrust violation may be found only if the union's use of a restraint is part of a scheme to regulate a product market by controlling prices, outputs, or market allocations).
 
 B. Labor Law Claim
 
 15
 In light of the special jury verdicts set forth in the margin,[13] Berman's labor law claim must be based essentially on establishing that it was entitled to a directed verdict on the secondary boycott issue and that the jury charge confused lawful primary activity with unlawful secondary activity. The alleged violation of section 303 of the LMRA, 29 U.S.C. § 187, depends on whether the Union violated section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4).
 
 
 16
 Under National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), it is now well settled that section 8(b)(4) (A) (which incorporates by reference section 8(e)) and section 8(b)(4)(B) of the NLRA are intended to prohibit not agreements or actions directed toward the primary employer, but secondary objectives such as the exertion of pressure on a neutral employer. The key question, therefore, is whether the provisions that the Union sought were aimed at preserving work and maintaining working conditions or whether they were tactically calculated by the Union to satisfy its objectives elsewhere. Id, at 644-45, 87 S.Ct. at 1268-1269. In NLRB v. International Longshoremen's Association, 447 U.S. 490, 503-504, 100 S.Ct. 2305, 2313, 65 L.Ed.2d 289 (1980), the Supreme Court stated that
 
 
 17
 a lawful work preservation agreement must pass two tests: First, it must have as its objective the preservation of work traditionally performed by employees represented by the union. Second, the contracting employer must have the power to give the employees the work in question the so-called "right of control" test ....
 
 
 18
 And the Circuit Court for the District of Columbia, discussing contract clauses analogous to the "two men on a barge" requirement in the instant case, noted that
 
 
 19
 (t)he test as to the "primary" nature of a subcontractor clause in an agreement with a general contractor has been phrased by scholars as whether it "will directly benefit employees covered thereby," and "seeks to protect the wages and job opportunities of the employees covered by the contract." We have phrased the test as whether the clauses are "germane to the economic integrity of the principal work unit," and seek "to protect and preserve the work and standards (the union) has bargained for," or instead "extend beyond the (contracting) employer and are aimed really at the union's difference with another employer."
 
 
 20
 Painters District Council 48 v. NLRB, 328 F.2d 534, 538 (D.C. Cir. 1964) (footnotes omitted). Although Berman claims that the Union's conduct fails these tests, the evidence does not sustain this argument.
 
 
 21
 Berman complains about Union pressure on the Association to force Association members not to tow Berman barges or to hire its tugs. Berman asserts that the history of the relationship between it and the Union shows that pressure on Association members not to tow Berman barges was exerted solely to impose manning and other labor requirements on nonunit vessels and nonunion employees. Indeed, Berman contends that any work preservation argument regarding this point is frivolous because when Berman hired an Association member's tug to tow a Berman barge, Berman gave work to, rather than took work away from, Association members' employees. But this is all a one-sided interpretation of the facts.
 
 
 22
 The "idle tugs"[14] and the "two men on a barge" requirements were designed to preserve jobs for the bargaining unit, protect Union tugmen from exposure to serious safety risks, and prevent erosion of contractual manning standards, see NLRB v. International Longshoremen's Association, 447 U.S. at 503, 504, 100 S.Ct. at 2313; NLRB v. National Maritime Union, 486 F.2d 907, 912 (2d Cir. 1973) ("subcontracting clauses ... which restrict subcontracting to those who observe certain pay scales and conditions of employment, are valid"), cert. denied, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974); Painters District Council 48, 328 F.2d at 538-39 (" 'to limit the work to employers maintaining labor standards commensurate with those required by the Union' was within 'the area of legitimate union claim' "). And as for Berman's claim that it was giving work to Association employees, this ignores the sometimes competitive relationship between Berman barges and Association barges, and the fact that use of Berman's under-manned barges may have taken jobs away from the bargaining unit. In short, as the Union points out, the Union's effort to secure the "idle tugs" rule was to preserve work and its pressure for the "two men on a barge" requirement was analogous to a legitimate "union standards" objective rather than to a prohibited "union signatory" purpose, see National Maritime Union, 486 F.2d at 912. The Union's conduct also is not vulnerable to Berman's "right to control" argument because the Union did not coerce Association members to obtain work for the Union that the members had no right or power to assign, NLRB v. Enterprise Association of Pipefitters, 429 U.S. 507, 521-28, 97 S.Ct. 891, 899-900, 903, 51 L.Ed.2d 1 (1977).
 
 
 23
 Certainly there was ample evidence to support this view that the Union's objectives were primary rather than secondary and thus, in our opinion, the trial judge properly sent the labor law issue to the jury. Furthermore, the jury charge correctly stated that if the Union's sole purpose was work preservation then the activity was primary and protected, but that if the Union's purpose was to force Berman to recognize the Union or to require Berman to join the Association then the jury had to find in favor of Berman. See National Woodwork, 386 U.S. at 644-45, 87 S.Ct. at 1268-1269.
 
 C. Evidence on Salaries
 
 24
 The final issue is an evidentiary one. Berman claims that the court erroneously permitted the appellees to present evidence about the salaries of Berman's officers to demonstrate that Berman had not been injured by the alleged antitrust and labor law violations and that this evidence unfairly prejudiced the jury. We cannot agree with this contention. The evidence on salaries was relevant to Berman's operations because Berman was a close corporation; it was also admissible to impeach the credibility of Berman's president, Mrs. Frank. It was within the trial judge's discretion to decide that the probative value of the evidence was not outweighed by unfair prejudice, see Fed.R.Evid. 403. As for the cases cited by Berman, see, e. g., United States v. Stahl, 616 F.2d 30, 31-33 (2d Cir. 1980); Koufakis v. Carvel, 425 F.2d 892, 900-05 (2d Cir. 1970), they are inapposite. In each of those cases the plaintiff had gone to great lengths to appeal to class prejudice in characterizing the defendant as a very rich man. Here, the salary information was simply one of many pieces of evidence and it was submitted for limited purposes, without either undue emphasis or unscrupulous references.
 
 
 25
 Judgment affirmed.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 When General Marine employees worked on Berman vessels, General Marine made payments to the Union-Association pension funds but the employees worked according to Berman wages and working conditions. Since January 1977 Berman employees' bargaining representative has been Marine Engineers Beneficial Association (MEBA)
 
 
 [2]
 "Vegetable oil barges" included any barge under 55,000 barrels used in the animal, vegetable, or fish oil trades
 
 
 [3]
 The "vegetable oil" clause read:
 
 
 [9]
 Section 29. Vegetable Oil Barges. No vessel operated under this contract shall tow any barge under 55,000 barrels used in the animal, vegetable, or fish oil trades unless there are two men aboard the barge at all times
 This clause was applicable to the Berman petroleum barges because they could be cleaned to carry vegetable oil.
 
 
 [4]
 The "affiliates" clause read in part:
 
 
 [8]
 Section 1. Application Agreement
 This Agreement applies only to all licensed and unlicensed Employees, employed on tugboats and self-propelled lighters owned or operated by the Employers, a subsidiary company, an affiliated company or a company division in the Port of New York and vicinity.
 It went on to provide for strikes against noncomplying employers.
 
 
 [5]
 In a column in a Union newspaper, the Union president further explained the Union-Association contract:
 For several years, we have been having problems with certain companies who have been trying every way possible to duck our contracts and the wages, benefits and working conditions our membership is entitled to under those contracts. The actions of these companies, and some of the men employed by them, have a ripple effect throughout the industry. The companies have been able to undercut the rates of companies abiding by the contract, and thus expand and take work away from others resulting in a loss of jobs for our members. The new clauses and clause revisions are designed to strengthen the contract against this type of action, making the companies competitively equal and thus providing greater job security for our membership. I have said in the past that knowing your contract is very important. It now becomes even more important that every member know and abide by this contract.
 
 
 [6]
 As explicated in Adams, Ray & Rosenberg v. William Morris Agency, 411 F.Supp. 403, 407-08 (C.D.Cal.1976), where litigation involves only union activities, the union may claim a statutory exemption under sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and under the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115; where litigation involves the activities of a union and employers, the defendants may claim a "nonstatutory exemption," Connell Construction Co. v. Plumbers Local 100, 421 U.S. 616, 622-23, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). See generally, R. Mann, B. Powers & B. Roberts, The Accommodation Between Antitrust and Labor Law: The Antitrust Labor Exemption, 9 Seton Hall L. Rev. 744 (1978)
 
 
 [7]
 The three questions, all answered negatively by the jury, were:
 
 
 [4]
 Did Local 333 induce or encourage its members to refuse to work for their employers when asked to work on Berman vessels or threaten, coerce or restrain the Association or the corporate defendants in order to:
 a. Force Berman to become a member of the Association?
 b. Force Berman to recognize Local 333 as the representative of its employees?
 c. Force the Association or the corporate defendants to cease doing business with Berman?
 Following the verdict, the trial judge denied motions for a new trial, for judgment notwithstanding the verdict against the Union on the labor law count, and for injunctive relief.
 
 
 [8]
 Although Justice White spoke for only a three-person plurality, his statement in Jewel Tea, 381 U.S. at 689-90, 85 S.Ct. at 1601-1602, is considered to be a classic formulation of the standard for determining applicability of the labor exemption. According to Justice White, the issue is whether the subject matter of the restriction
 is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act.
 
 
 [9]
 See note 8 supra
 
 
 [10]
 There was evidence that tug boat crews felt that unmanned barges were unsafe to tow. This suggests that barges manned by a single person might also be unsafe
 
 
 [11]
 Mrs. Frank, president of all three affiliated companies, testified as follows:
 Q. The directors of Berman and the directors of General Marine are the same people, are they not?
 A. That's right.
 Q. You as the chief operating officer of Berman and of General Marine use the employees of Berman and General Marine fungibly (sic) and interchangeably, is that correct?
 A. That's correct.
 Q. You have Berman employees doing General Marine work and General Marine employees doing Berman work, is that correct?
 A. I would say mostly it was General Marine doing Berman work.
 Q. In any event, you did use them fungibly (sic) and interchangeably, is that correct?
 A. That's right, with union consent.
 
 
 [12]
 See note 5 supra
 
 
 [13]
 See note 7 supra
 
 
 [14]
 This refers to the Union effort to obtain a commitment from employers not to hire outside tugs when their own tugs stood idle